# HAWAII *v.* STANDARD OIL CO. OF CALIFORNIA
## ET AL.

No. 70–49.   Argued October 21, 1971—Decided March 1, 1972

MARSHALL, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, WHITE, and BLACKMUN, JJ., joined. DOUGLAS, J., filed a dissenting opinion, *post*, p. 266. BRENNAN, J., filed a dissenting opinion, in which DOUGLAS, J., joined *post*, p. 270. POWELL and REHNQUIST, JJ., took no part in the consideration or decision of the case.

*Maxwell M. Blecher* argued the cause for petitioner. With him on the briefs were *Bertram Kanbara,* Attorney General of Hawaii, *Hiromu Suzawa,* Acting Attorney General, *George Pai,* Deputy Attorney General, *Joseph L. Alioto,* and *Peter J. Donnici.*

*Francis R. Kirkham* argued the cause for respondents. With him on the brief were *Richard J. MacLaury, Moses Lasky, Malcolm T. Dungan,* and *William Simon.*

Briefs of *amici curiae* urging reversal were filed by *Evelle J. Younger,* Attorney General of California, and *Anthony C. Joseph, Robert Murphy, Herbert Davis, Michael I. Spiegel,* and *Carole A. Kornblum,* Deputy Attorneys General, for the State of California, and by the Attorneys General and other officials for their respective States and jurisdictions as follows: *William T. Baxley,* Attorney General of Alabama, *Gary K. Nelson,* Attorney General of Arizona, *Ray Thornton,* Attorney General of Arkansas, *Duke W. Dunbar,* Attorney General of Colorado, *Robert K. Killian,* Attorney General of Connecticut, *W. Laird Stabler, Jr.,* Attorney General

of Delaware, *Robert L. Shevin,* Attorney General of Florida, *W. Anthony Park,* Attorney General of Idaho, *William J. Scott,* Attorney General of Illinois, *Richard C. Turner,* Attorney General of Iowa, *Vern Miller,* Attorney General of Kansas, *John B. Breckinridge,* Attorney General of Kentucky, *Jack P. F. Gremillion,* Attorney General of Louisiana, *James S. Erwin,* Attorney General of Maine, *Robert H. Quinn,* Attorney General of Massachusetts, *Frank J. Kelley,* Attorney General of Michigan, *Warren Spannaus,* Attorney General of Minnesota, *John C. Danforth,* Attorney General of Missouri, *Robert L. Woodahl,* Attorney General of Montana, *Robert List,* Attorney General of Nevada, *Warren B. Rudman,* Attorney General of New Hampshire, *George F. Kugler, Jr.,* Attorney General of New Jersey, *David L. Norvell,* Attorney General of New Mexico, *Louis J. Lefkowitz,* Attorney General of New York, *Helgi Johanneson,* Attorney General of North Dakota, *William J. Brown,* Attorney General of Ohio, *Larry Derryberry,* Attorney General of Oklahoma, *Richard J. Israel,* Attorney General of Rhode Island, *Gordon Mydland,* Attorney General of South Dakota, *David M. Pack,* Attorney General of Tennessee, *Crawford C. Martin,* Attorney General of Texas, *Vernon B. Romney,* Attorney General of Utah, *James M. Jeffords,* Attorney General of Vermont, *Andrew P. Miller,* Attorney General of Virginia, *Slade Gorton,* Attorney General of Washington, *Chauncey H. Browning, Jr.,* Attorney General of West Virginia, *Robert W. Warren,* Attorney General, and *George F. Sieker,* Assistant Attorney General, of Wisconsin, and *J. Lee Rankin* of the City of New York.

MR. JUSTICE MARSHALL delivered the opinion of the Court.

The issue presented by this case is whether § 4 of the Clayton Act, 38 Stat. 731, 15 U. S. C. § 15, authorizes a

State to sue for damages for an injury to its economy allegedly attributable to a violation of the antitrust laws of the United States. We hold that it does not.

## I. PROCEDURAL HISTORY

Hawaii filed its initial complaint on April 1, 1968, against three of the four respondents.[1] On May 24, 1968, and again on August 19, 1968, Hawaii filed amended complaints. The third amended complaint, filed on September 6, 1968, raised for the first time the issue presented herein. That complaint named all four respondents as defendants and charged them with violating the Sherman Act, 26 Stat. 209, 15 U. S. C. § 1, in the following ways: by entering into unlawful contracts; by conspiring and combining to restrain trade and commerce in the sale, marketing, and distribution of refined petroleum products; and by attempting to monopolize and actually monopolizing said trade and commerce.[2] The State sought to recover damages in three distinct capacities: in its proprietary capacity for overcharges for petroleum products sold to the State itself (first count); as *parens patriae* for similar overcharges paid by the citizens of the State (second count); and as the representative of the class of all purchasers in Hawaii for identical overcharges (third count).

The second count read, in relevant part:

"18. The above-named plaintiff [Hawaii], [acts] in its capacity as *parens patriae,* and/or as trustee

---

[1] Chevron Asphalt Co. was not named as a defendant in the initial complaint. As pointed out in the text, *infra,* the company was named as a defendant in the third and fourth amended complaints which raise the question presented to the Court.

[2] In the third amended complaint, the State abandoned a claim made in the initial complaint that the Robinson-Patman Act, 49 Stat. 1526, 15 U. S. C. § 13 (a), had been violated. This claim has not been resurrected in any of the later stages of the proceedings.

for the use of its citizens who purchased refined petroleum products, from any defendant or co-conspirator herein . . . .

"19. The unlawful contracts, combination, conspiracy in restraint of trade, unlawful combination and conspiracy to monopolize, and monopolization have resulted in the plaintiff, . . . and in its citizens, paying more for refined petroleum products than would have been paid in a freely operating competitive market. Plaintiff has not yet ascertained the precise extent of said damage to itself and its citizens, however, when said amount has been ascertained, plaintiff will ask leave of Court to insert said sum herein."

Very similar language appeared in the class-action count. In all three counts, the State sought both injunctive and monetary relief.

After each of the respondents moved to dismiss the second and third counts of the complaint, the District Court held a hearing to determine the propriety of the State's suing on behalf of its citizens. With respect to count two, the court held that Hawaii "has not even alleged an interest in its citizens' claims, much less interest of its own aside from the State's proprietary rights," and granted the motions to dismiss.[3] Viewing the class action as being "overlapping, parallel and/or alternative to" the *parens patriae* claim, the court dismissed the third count as well.[4]

Hawaii filed its fourth amended complaint on February 27, 1969. This is the complaint with which we are concerned. Count one contains a reiteration of Hawaii's claim that in its proprietary capacity the State paid an

[3] The opinion of the court is unreported, but is contained in App. 51–58.

[4] *Id.,* at 58.

excessive price for the petroleum products that it purchased from respondents. Count two states a new *parens patriae* claim, and count three is drawn as a class action.

The *parens patriae* claim is stated in the following manner:

"19. The State of Hawaii, acting through its Attorney General, brings this action by virtue of its duty to protect the general welfare of the State and its citizens, acting herein as *parens patriae,* trustee, guardian and representative of its citizens, to recover damages for, and secure injunctive relief against, the violations of the antitrust laws hereinbefore alleged.

"20. The unlawful contracts, combination and conspiracy in restraint of trade, unlawful combination and conspiracy to monopolize and monopolization, hereinbefore alleged, have injured and adversely affected the economy and prosperity of the State of Hawaii in, among others, the following ways:

"(a) revenues of its citizens have been wrongfully extracted from the State of Hawaii;

"(b) taxes affecting the citizens and commercial entities have been increased to affect such losses of revenues and income;

"(c) opportunity in manufacturing, shipping and commerce have [*sic*] been restricted and curtailed;

"(d) the full and complete utilization of the natural wealth of the State has been prevented;

"(e) the high cost of manufacture in Hawaii has precluded goods made there from equal competitive access with those of other States to the national market;

"(f) measures taken by the State to promote the general progress and welfare of its people have been frustrated;

"(g) the Hawaii economy has been held in a state of arrested development.

"21. Plaintiff has not yet ascertained the precise extent of said damage to itself and its citizens; however, when said amount has been ascertained, plaintiff will ask leave of Court to insert said sum herein."

The class-action count is similar to that in the third amended complaint. As in the previous complaint, Hawaii seeks both injunctive and monetary relief in each count.

Respondents moved to dismiss the second and third counts, and hearing was again had in the District Court. The class action was dismissed by the court on the ground that "under the circumstances . . . , the class action based upon the injury to every individual purchaser of gasoline in the State, . . . in the context of the pleadings, would be unmanageable." [5] In a rather extensive opinion, the court examined the law that has developed concerning suits by a State as *parens patriae* and denied the motions to dismiss the second count. 301 F. Supp. 982 (1969). Recognizing that the state of the law was unclear, the District Court certified its decision denying the motions to dismiss for an interlocutory appeal pursuant to 28 U. S. C. § 1292 (b). [6] On appeal, the United States Court of Appeals for the Ninth Circuit reversed the decision of the District Court and directed that the second count of the complaint be dismissed. [7] 431 F. 2d

---

[5] Reporter's Tr. 154 (May 29, 1969).

[6] The District Court offered to certify its dismissal of Hawaii's class-action count, but Hawaii indicated its intention not to appeal the ruling. Since the ruling was not appealed it is not before the Court for review.

[7] Although the Court of Appeals directed that the count be dismissed in its entirety, the parties have not suggested that its decision foreclosed any relief the State might obtain by way of injunction.

1282 (1970). Certiorari was granted so that we might review this decision. 401 U. S. 936 (1971).

## II. The State as Parens Patriae

The concept of *parens patriae* is derived from the English constitutional system. As the system developed from its feudal beginnings, the King retained certain duties and powers, which were referred to as the "royal prerogative." Malina & Blechman, Parens Patriae Suits for Treble Damages Under the Antitrust Laws, 65 Nw. U. L. Rev. 193, 197 (1970) (hereinafter Malina & Blechman); State Protection of its Economy and Environment: Parens Patriae Suits for Damages, 6 Col. J. L. & Soc. Prob. 411, 412 (1970) (hereinafter State Protection). These powers and duties were said to be exercised by the King in his capacity as "father of the country." [8] Traditionally, the term was used to refer to the King's power as guardian of persons under legal disabilities to act for themselves.[9] For example, Blackstone refers to the sovereign or his representative as "the general guardian of all infants, idiots, and lunatics," [10] and as the superintendent of "all charitable uses in the kingdom." [11] In the United States, the "royal prerogative" and the "parens patriae" function of the King passed to the States.

The nature of the *parens patriae* suit has been greatly expanded in the United States beyond that which existed in England. This expansion was first evidenced in *Louisiana* v. *Texas,* 176 U. S. 1 (1900), a case in which the State of Louisiana brought suit to enjoin officials of the State of Texas from so administering the Texas quarantine regulations as to prevent Louisiana mer-

---

[8] Malina & Blechman, at 197; State Protection, at 412.

[9] State Protection, at 412.

[10] 3 W. Blackstone, Commentaries *47.

[11] *Ibid.*

chants from sending goods into Texas. This Court recognized that Louisiana was attempting to sue, not because of any particular injury to a business of the State, but as *parens patriae* for all her citizens. 176 U. S., at 19. While the Court found that *parens patriae* could not properly be invoked in that case, the propriety and utility of *parens patriae* suits were clearly recognized.

This Court's acceptance of the notion of *parens patriae* suits in *Louisiana* v. *Texas* was followed in a series of cases: *Missouri* v. *Illinois,* 180 U. S. 208 (1901) (holding that Missouri was permitted to sue Illinois and a Chicago sanitation district on behalf of Missouri citizens to enjoin the discharge of sewage into the Mississippi River); *Kansas* v. *Colorado,* 206 U. S. 46 (1907) (holding that Kansas was permitted to sue as *parens patriae* to enjoin the diversion of water from an interstate stream); *Georgia* v. *Tennessee Copper Co.,* 206 U. S. 230 (1907) (holding that Georgia was entitled to sue to enjoin fumes from a copper plant across the state border from injuring land in five Georgia counties); *New York* v. *New Jersey,* 256 U. S. 296 (1921) (holding that New York could sue to enjoin the discharge of sewage into the New York harbor); *Pennsylvania* v. *West Virginia,* 262 U. S. 553 (1923) (holding that Pennsylvania might sue to enjoin restraints on the commercial flow of natural gas); and *North Dakota* v. *Minnesota,* 263 U. S. 365 (1923) (holding that Minnesota could sue to enjoin changes in drainage which increase the flow of water in an interstate stream).

These cases establish the right of a State to sue as *parens patriae* to prevent or repair harm to its "quasi-sovereign" interests.[12] They deal primarily with original

---

[12] Article III, § 2, of the Constitution confers original jurisdiction upon this Court over suits between States or by one State against a citizen of another State. In order to properly invoke this jurisdiction, the State must bring an action on its own behalf and not on

suits brought directly in this Court pursuant to Art. III, § 2, of the Constitution under common-law rights of action. The question in this case is not whether Hawaii may maintain its lawsuit on behalf of its citizens, but rather whether the injury for which it seeks to recover is compensable under § 4 of the Clayton Act. Hence, Hawaii's claim cannot be resolved simply by reference to any general principles governing *parens patriae* actions.

The only time this Court has ever faced the question of what relief, if any, the antitrust laws offer a State suing as *parens patriae* was in *Georgia* v. *Pennsylvania R. Co.*, 324 U. S. 439 (1945), the case relied on most heavily by the parties herein. In that case, Georgia sought to invoke the original jurisdiction of this Court by filing an amended bill of complaint against 20 railroads, alleging, in essence, that the railroads had conspired to restrain trade and to fix prices in a manner that would favor shippers in other States (particularly Northern States) to the detriment of Georgia shippers.

Like this suit, *Georgia* arose under the federal antitrust laws. It is plain from the face of the complaint that "[t]he prayer [was] for damages and for injunctive relief." 324 U. S., at 445. See *id.*, at 446–447, 450–451.[13] Georgia claimed that the conspiracy had

behalf of particular citizens. See, *e. g.*, *Louisiana* v. *Texas*, 176 U. S. 1 (1900); *New Hampshire* v. *Louisiana*, 108 U. S. 76 (1883); *Oklahoma* v. *Atchison, T. & S. F. R. Co.*, 220 U. S. 277 (1911). An action brought by one State against another violates the Eleventh Amendment if the plaintiff State is actually suing to recover for injuries to designated individuals. See, *e. g.*, *New Hampshire* v. *Louisiana, supra;* *North Dakota* v. *Minnesota*, 263 U. S. 365, 376 (1923).

[13] It is evident from the bill of complaint that Georgia sought to sue in four slightly different capacities: its sovereign capacity (first count); as a quasi-sovereign (second count); its proprietary capacity (third count); and as protector of a general class of its citizens (fourth count). Damages were sought in each count, although treble damages were sought only on the last count.

severely damaged its economy and sought to recover damages on behalf of its citizens.

The Court upheld Georgia's claim as *parens patriae* with respect to injunctive relief, but had no occasion to consider whether the antitrust laws also authorized damages for an injury to the State's economy, since approval of the challenged rates by the Interstate Commerce Commission barred a damage recovery on the ground that such a remedy would have given Georgia shippers an unfair advantage over shippers from other States. See *Keogh* v. *Chicago & Northwestern R. Co.*, 260 U. S. 156 (1922). Nowhere in *Georgia* did the Court address itself to the question whether § 4 of the Clayton Act authorizes damages for an injury to the general economy of a State. Thus, the question presented here is open.

### III. HAWAII AND THE ANTITRUST LAWS

Hawaii grounds its claim for treble damages in § 4 of the Clayton Act, 15 U. S. C. § 15, which reads:

> "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

This section is notably different from § 16 of the Clayton Act, 15 U. S. C. § 26, which provides for injunctive relief:

> "Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage

by a violation of the antitrust laws . . . when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings . . . ."

Hawaii plainly qualifies as a person under both sections of the statute, whether it sues in its proprietary capacity or as *parens patriae*. *Georgia* v. *Pennsylvania R. Co.*, 324 U. S., at 447. But the critical question is whether the injury asserted by Hawaii in its *parens patriae* count is an injury to its "business or property."

The legislative history of the Sherman and Clayton Acts is not very instructive as to why Congress included the "business or property" requirement in § 4, but not in § 16. The most likely explanation lies in the essential differences between the two remedies.

While the United States Government, the governments of each State, and any individual threatened with injury by an antitrust violation may all sue for injunctive relief against violations of the antitrust laws, and while they may theoretically do so simultaneously against the same persons for the same violations, the fact is that one injunction is as effective as 100, and, concomitantly, that 100 injunctions are no more effective than one. This case illustrates the point well. The parties are in virtual agreement that whether or not Hawaii can sue for injunctive relief as *parens patriae* is of little consequence so long as it can seek the same relief in its proprietary capacity. While some theoretical differences may exist with respect to the parties capable of enforcing a *parens patriae* injunction as opposed to one secured by a State in its proprietary capacity, these differences are not crucial to the defendant in an antitrust case.

The position of a defendant faced with numerous claims for damages is much different. If the defendant

is sued by 100 different persons or by one person with 100 separate but cumulative claims, and each claim is for damages, the potential liability is obviously far greater than if only one of those persons sued on only one claim. Thus, there is a striking contrast between the potential impact of suits for injunctive relief and suits for damages.

Every violation of the antitrust laws is a blow to the free-enterprise system envisaged by Congress. See *Northern Pacific R. Co.* v. *United States,* 356 U. S. 1, 4 (1958). This system depends on strong competition for its health and vigor, and strong competition depends, in turn, on compliance with antitrust legislation. In enacting these laws, Congress had many means at its disposal to penalize violators. It could have, for example, required violators to compensate federal, state, and local governments for the estimated damage to their respective economies caused by the violations. But, this remedy was not selected. Instead, Congress chose to permit all persons to sue to recover three times their actual damages every time they were injured in their business or property by an antitrust violation. By offering potential litigants the prospect of a recovery in three times the amount of their damages, Congress encouraged these persons to serve as "private attorneys general." See, *e. g., Zenith Radio Corp.* v. *Hazeltine Research, Inc.,* 395 U. S. 100, 130–131 (1969); *Perma Life Mufflers, Inc.* v. *International Parts Corp.,* 392 U. S. 134, 147 (1968) (Fortas, J., concurring in result).

Thus, § 4 permits Hawaii to sue in its proprietary capacity for three times the damages it has suffered from respondents' alleged antitrust violations.[14] The section

---

[14] It is true, as MR. JUSTICE BRENNAN suggests, that an injury to the State in its proprietary capacity, as alleged in count one of the complaint, affects the citizens in much the same way as an injury of the sort claimed by Hawaii here. Each has the effect of

gives the same right to every citizen of Hawaii with respect to any damage to business or property. Were we, in addition, to hold that Congress authorized the State

increasing taxes, or reducing government services, or both. But this does not mean that the two kinds of injuries are identical in nature. Where the injury to the State occurs in its capacity as a consumer in the marketplace, through a "payment of money wrongfully induced," *Chattanooga Foundry & Pipe Works* v. *City of Atlanta,* 203 U. S. 390, 396 (1906), damages are established by the amount of the overcharge. Under § 4, courts will not go beyond the fact of this injury to determine whether the victim of the overcharge has partially recouped its loss in some other way, even though a State, for example, may ultimately recoup some part of the overcharge through increased taxes paid by the seller. See *Hanover Shoe, Inc.* v. *United Shoe Machinery Corp.,* 392 U. S. 481, 489 (1968). Measurement of an injury to the general economy, on the other hand, necessarily involves an examination of the impact of a restraint of trade upon every variable that affects the State's economic health—a task extremely difficult, "in the real economic world rather than an economist's hypothetical model." *Id.,* at 493.

The lower courts have been virtually unanimous in concluding that Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation. See, *e. g., Miley* v. *John Hancock Mutual Life Insurance Co.,* 148 F. Supp. 299, 303 (Mass.), aff'd, 242 F. 2d 758 (CA1), cert. denied, 355 U. S. 828 (1957); *Billy Baxter, Inc.* v. *Coca-Cola Co.,* 431 F. 2d 183 (CA2 1970), cert. denied, 401 U. S. 923 (1971); *Kauffman* v. *Dreyfus Fund, Inc.,* 434 F. 2d 727, 732–734 (CA3 1970), cert. denied, 401 U. S. 974 (1971); *South Carolina Council* v. *Newton,* 360 F. 2d 414, 419 (CA4), cert. denied, 385 U. S. 934 (1966); *Dailey* v. *Quality School Plan, Inc.,* 380 F. 2d 484 (CA5 1967); *Volasco Products Co.* v. *Lloyd A. Fry Roofing Co.,* 308 F. 2d 383, 395 (CA6 1962), cert. denied, 372 U. S. 907 (1963); *Commonwealth Edison Co.* v. *Allis-Chalmers Mfg. Co.,* 315 F. 2d 564, 566–567 (CA7), cert. denied *sub nom. Illinois* v. *Commonwealth Edison Co.,* 375 U. S. 834 (1963); *Sanitary Milk Producers* v. *Bergjans Farm Dairy, Inc.,* 368 F. 2d 679, 688–689 (CA8 1966); *Hoopes* v. *Union Oil Co.,* 374 F. 2d 480, 485 (CA9 1967); *Nationwide Auto App. Serv.* v. *Association of C. & S. Co.,* 382 F. 2d 925, 928–929 (CA10 1967).

to recover damages for injury to its general economy, we would open the door to duplicative recoveries.

A large and ultimately indeterminable part of the injury to the "general economy," as it is measured by economists, is no more than a reflection of injuries to the "business or property" of consumers, for which they may recover themselves under § 4. Even the most lengthy and expensive trial could not, in the final analysis, cope with the problems of double recovery inherent in allowing damages for harm both to the economic interests of individuals and for the quasi-sovereign interests of the State. At the very least, if the latter type of injury is to be compensable under the antitrust laws, we should insist upon a clear expression of a congressional purpose to make it so, and no such expression is to be found in § 4 of the Clayton Act.

Like the lower courts that have considered the meaning of the words "business or property," we conclude that they refer to commercial interests or enterprises. See, *e. g., Roseland* v. *Phister Mfg. Co.,* 125 F. 2d 417 (CA7 1942); *Hamman* v. *United States,* 267 F. Supp. 420 (Mont. 1967), appeal dismissed, 399 F. 2d 673 (CA9 1968); *Broadcasters, Inc.* v. *Morristown Broadcasting Corp.,* 185 F. Supp. 641 (NJ 1960). When the State seeks damages for injuries to its commercial interests, it may sue under § 4. But where, as here, the State seeks damages for other injuries, it is not properly within the Clayton Act.

Support for this reading of § 4 is found in the legislative history of 15 U. S. C. § 15a,[15] which is the only

---

[15] "Whenever the United States is hereafter injured in its business or property by reason of anything forbidden in the antitrust laws it may sue therefor . . . , and shall recover actual damages by it sustained and the cost of suit." 69 Stat. 282, 15 U. S. C. § 15a.

This section was enacted in 1955 following the decision in *United States* v. *Cooper Corp.,* 312 U. S. 600 (1941), which held that the United States was not a "person" within the meaning of § 7 of the

provision authorizing recovery in damages by the United States, and which limits that recovery to damages to "business or property." The legislative history of that provision makes it quite plain that the United States was authorized to recover, not for general injury to the national economy or to the Government's ability to carry out its functions, but only for those injuries suffered in its capacity as a consumer of goods and services.

> "The United States is, of course, amply equipped with the criminal and civil process with which to enforce the antitrust laws. The proposed legislation, quite properly, treats the United States solely as a buyer of goods and permits the recovery of the actual damages suffered." S. Rep. No. 619, 84th Cong., 1st Sess., 3 (1955).

See also H. R. Rep. No. 422, 84th Cong., 1st Sess., 2–5 (1955). In light of the language used as well as the legislative history of 15 U. S. C. § 15a, it is manifest that the United States cannot recover for economic injuries to its sovereign interests, as opposed to its proprietary functions. And the conclusion is nearly inescapable that § 4, which uses identical language, does not authorize recovery for economic injuries to the sovereign interests of a State.

We note in passing the State's claim that the costs and other burdens of protracted litigation render private citizens impotent to bring treble-damage actions, and thus that denying Hawaii the right to sue for injury to her quasi-sovereign interests will allow antitrust violations to go virtually unremedied. Private citizens are not as powerless, however, as the State suggests.

---

Sherman Act (the predecessor of § 4 of the Clayton Act). Recovery is limited to actual rather than treble damages because Congress reasoned that the United States, unlike a private party, needed no extraordinary incentive to bring antitrust suits. H. R. Rep. No. 422, 84th Cong., 1st Sess., 3 (1955).

Congress has given private citizens rights of action for injunctive relief and damages for antitrust violations without regard to the amount in controversy. 28 U. S. C. § 1337; 15 U. S. C. § 15. Rule 23 of the Federal Rules of Civil Procedure provides for class actions that may enhance the efficacy of private actions by permitting citizens to combine their limited resources to achieve a more powerful litigation posture. The District Court dismissed Hawaii's class action only because it was unwieldy; it did not hold that a State could never bring a class action on behalf of some or all of its consumer citizens. Respondents, in moving to dismiss count three of the fourth amended complaint, in which the State sought to bring such an action, virtually conceded that class actions might be appropriate under certain circumstances. The fact that a successful antitrust suit for damages recovers not only the costs of the litigation, but also attorney's fees, should provide no scarcity of members of the Bar to aid prospective plaintiffs in bringing these suits.

*Parens patriae* actions may, in theory, be related to class actions, but the latter are definitely preferable in the antitrust area. Rule 23 provides specific rules for delineating the appropriate plaintiff-class, establishes who is bound by the action, and effectively prevents duplicative recoveries.

The judgment of the Court of Appeals is affirmed for the reasons stated above.

*So ordered.*

Mr. Justice Powell and Mr. Justice Rehnquist took no part in the consideration or decision of this case.

Mr. Justice Douglas, dissenting.

Today's decision reflects a miserly approach to the fashioning of federal remedies rectifying injuries to the collective interests of the citizens of a State through

action by the State itself. It is reminiscent of the ill-starred decision in *Ohio* v. *Wyandotte Chemicals Corp.*, 401 U. S. 493.[1]

Hawaii, in her fourth amended complaint, sues for damages and injunctive relief as *parens patriae* by virtue of her "duty to protect the general welfare of the State and its citizens." She alleges that the alleged conspiracy among the respondent oil companies has "injured and adversely affected the economy and prosperity" of Hawaii as follows:

> "(a) revenues of its citizens have been wrongfully extracted from the State of Hawaii;
>
> "(b) taxes affecting the citizens and commercial entities have been increased to affect such losses of revenues and income;
>
> "(c) opportunity in manufacturing, shipping and commerce have been restricted and curtailed;
>
> "(d) the full and complete utilization of the natural wealth of the State has been prevented;
>
> "(e) the high cost of manufacture in Hawaii has precluded goods made there from equal competitive access with those of other States to the national market;
>
> "(f) measures taken by the State to promote the general progress and welfare of its people have been frustrated;

---

[1] In *Wyandotte*, the Court refused to exercise its conceded original jurisdiction over an original complaint filed by the State of Ohio to enjoin alleged pollution of Lake Erie by manufacturing plants in Michigan and Ontario, Canada, because "as a practical matter, it would be inappropriate for this Court to attempt to adjudicate the issues . . . ." 401 U. S., at 501. In the light of our rules permitting the appointment of special masters, however, this rationale is questionable at best. *Id.*, at 510–512 (DOUGLAS, J., dissenting). See generally Woods & Reed, The Supreme Court and Interstate Environmental Quality: Some Notes on the *Wyandotte* Case, 12 Ariz. L. Rev. 691 (1970).

"(g) the Hawaii economy has been held in a state of arrested development."

I see no way of distinguishing the instant case from *Georgia* v. *Pennsylvania R. Co.*, 324 U. S. 439. The *Georgia* case held that a State may sue as *parens patriae* under the antitrust laws for injury to the economy of the State resulting from a conspiracy to restrain trade and commerce through the fixing of railroad rates. *Id.*, at 446. As we said:

"Georgia as a representative of the public is complaining of a wrong which, if proven, limits the opportunities of her people, shackles her industries, retards her development, and relegates her to an inferior economic position among her sister States. These are matters of grave public concern in which Georgia has an interest apart from that of particular individuals who may be affected." *Id.*, at 451.

So-called "growth," "progress," and "development" are more than symbols of power in modern society; they represent the goal which planners—private and public alike—establish and seek to attain. And the State plays an important, at times crucial, role in achieving that goal.[2] If Hawaii can sustain her allegations by proof,

---

[2] "In these three respects—as a clearing house for necessary institutional innovations; as an agency for resolution of conflicts among group interests; and as a major entrepreneur for the socially required infrastructure—the sovereign state assumes key importance in channeling the explosive impacts of continuous structural changes, in providing a proper framework in which these structural changes, proceeding at revolutionary speed, are contained and prevented from exploding into a civil war (as they sometimes may, and have). Thus, the high rate of change in economic structure is linked to the importance of the sovereign state as an organizing unit. It is not accidental that, in measuring and analyzing economic growth, we talk of the economic growth of *nations* and use *national* economic accounts. In doing so, we imply that the sovereign state is an

she establishes injury both as respects her tourism and her industry, her "growth" and her "development."

The Court of Appeals was "skeptical of the existence of an independent harm to the general economy." 431 F. 2d 1282, 1285. But as Alabama states in her brief *amicus:*

> "Economists have developed models for measuring the effects upon local economies from infusions or extractions of given sums of money from those economies. In short, a state's economy is susceptible of articulation and measurement."

Hawaii is the magnet of tourism and of industry as well. She measures the health of her economy by her economic growth. No one citizen can stand in her shoes in those respects, for she represents the collective. Those interests should be held to be the State's "business or property" interests, within the meaning of the Clayton Act, and not merely the plants, factories, or hotels which she may own as a proprietor. We held as much in the *Georgia* case. It is indisputable that if Hawaii does prove damages, *Georgia* authorizes recovery. For as MR. JUSTICE BRENNAN points out, Georgia was denied damages only because of a technicality irrelevant to the present case.

Injury to the collective will commonly include injury to members of the collective. In that event damages recovered by Hawaii could not later be recovered by individual entrepreneurs. It might, of course, be shown that the individual's loss for the period in question was distinct from any impact on the collective. Thus, if

important factor in modern economic growth; that, given the transnational, worldwide character of the supply of useful knowledge and science, the major permissive factor of modern economic growth, the state unit, in adjusting economic and social institutions to facilitate and maximise application, plays a crucial supplementary role." S. Kuznets, Economic Growth of Nations 346–347 (1971).

Hawaii failed to prove that the alleged conspiracy damaged her economy, a single entrepreneur might still be able to prove that it drove him to the wall. The difficulties advanced in this regard are more imaginary than real. They are doubtless rationales that express a prejudice against liberal construction of the antitrust laws. Since a collective damage is alleged, I would allow the case to go to trial, saving to Congress the question whether § 4 of the Clayton Act should be restricted to a State's proprietary interests.

I would adhere to the *Georgia* case and allow Hawaii a chance to prove her charges and to establish the actuality of damages or the need for equitable relief.[3]

I would reverse the judgment and remand the case for trial.[4]

MR. JUSTICE BRENNAN, with whom MR. JUSTICE DOUGLAS joins, dissenting.

The State of Hawaii seeks treble damages and injunctive relief for an alleged conspiracy among respondents to monopolize and fix prices on the sale of petroleum

---

[3] The question of injunctive relief concerns the meaning of § 16 of the Clayton Act which grants relief to any "person" against loss or damage by a violation of "the antitrust" laws. It is settled that a State is a "person" within the meaning of § 16. *Georgia* v. *Pennsylvania R. Co.*, 324 U. S. 439, 452. Hence, it is clear that even if Hawaii does not prove damages, equitable relief is available as it was in the *Georgia* case.

[4] My quarrel with the Court does not extend to its approving reference to the possibility that Hawaii may yet be able to maintain a class action on behalf of her consumers, *ante*, at 266. Cf. Comment, Wrongs Without Remedy: The Concept of Parens Patriae Suits for Treble Damages Under the Antitrust Laws, 43 S. Cal. L. Rev. 570, 580–583 (1970). The District Court's dismissal of Hawaii's class action count as "unmanageable" was not certified for interlocutory appeal, and Hawaii's rights under Fed. Rule Civ. Proc. 23 are not before us for review.

products in the State. Count one of Hawaii's complaint alleges an economic injury to the State in its proprietary capacity as purchaser of those products. Count two states a claim by the State, as *parens patriae,* for injury to its "economy and prosperity," including the withdrawal of its citizens' revenues, increased taxes to offset such losses, curtailment of manufacturing, shipping, and commerce, and injury to the competitive position of Hawaiian goods in the national market. Count three alleges a class action on behalf of all purchasers in the State of respondents' petroleum products. The District Court dismissed count three as unmanageable, but denied respondents' motion to dismiss Count two, the *parens patriae* claim. An interlocutory appeal was taken by respondents under 28 U. S. C. § 1292 (b), and the Court of Appeals for the Ninth Circuit reversed and ordered dismissal of count two. The Court of Appeals held that even if the State's economy might suffer injury from antitrust violations independent of the injury suffered by private persons, that injury would not be to the State's "business or property" within the meaning of § 4 of the Clayton Act, and in any event would be too remote from respondents' alleged violations to permit the State to recover as *parens patriae.*

*Georgia* v. *Pennsylvania R. Co.,* 324 U. S. 439 (1945), in my view, requires reversal. In that case the State of Georgia sought to invoke the original jurisdiction of this Court to remedy a conspiracy by several railroads to fix rates on the transportation of goods to and from the State. As noted by the Court, *ante,* at 259 n. 13, Georgia sought damages in each of the four counts of its complaint—in its sovereign capacity, as a quasi-sovereign, in its proprietary capacity, and as representative of its citizens. Treating the complaint as a prayer "for damages and for injunctive relief," 324

U. S., at 445, the Court held that Georgia, both as *parens patriae* and proprietor, was an appropriate party to bring these claims:

"The enforcement of the criminal sanctions of [the antitrust] acts has been entrusted exclusively to the federal government. See *Georgia* v. *Evans,* [316 U. S. 159,] 162. But when it came to other sanctions Congress followed a different course and authorized civil suits not only by the United States but by other persons as well. And we find no indication that, when Congress fashioned those civil remedies, it restricted the States to suits to protect their proprietary interests. Suits by a State, *parens patriae,* have long been recognized. There is no apparent reason why those suits should be excluded from the purview of the anti-trust acts." *Id.,* at 447.

Georgia was in fact denied damages, but only because such recovery might operate as an illegal rebate on rates already approved by the Interstate Commerce Commission. See *Keogh* v. *Chicago & Northwestern R. Co.,* 260 U. S. 156 (1922). Implicit in the decision, however, was the holding that Georgia, as *parens patriae,* could have recovered damages under the antitrust laws for a conspiracy involving other than agency-approved transportation charges. That holding applies with equal force here. Hawaii is complaining, not of an affront to its abstract sovereignty, but of the economic loss occasioned by respondents' conspiracy. As in *Georgia,* this can only be characterized as a wrong to the State "which, if proven, limits the opportunities of her people, shackles her industries, retards her development, and relegates her to an inferior economic position among her sister States." 324 U. S., at 451. If that injury would have been a sufficient basis for a damage claim by

Georgia, as we held in that case, then it supports an identical action by Hawaii here.

Even if *Georgia* were not dispositive, I would still find in Hawaii's *parens patriae* count a claim of injury to its "business or property" sufficient to state a claim under § 4. There runs through the Court's opinion an assumption that Hawaii's proprietary claims, though concededly sufficient to state a cause of action, are wholly distinct in concept from those raised by the State as *parens patriae*. While I agree that the two counts represent injuries to the State in separate capacities, the injuries themselves are not so unrelated as to justify a different treatment under the Clayton Act. In *Chattanooga Foundry & Pipe Works* v. *City of Atlanta*, 203 U. S. 390 (1906), the city brought a treble-damages action against two pipe companies whose trust and combination had been invalidated in *Addyston Pipe & Steel Co.* v. *United States*, 175 U. S. 211 (1899). Claiming injury " 'in its business or property,' " 203 U. S., at 395, the city sought damages in its capacity as a purchaser of water pipes for the municipal water system. In upholding the right of the city to bring that action, the Court stated:

> "It was injured in its property, at least, if not in its business of furnishing water, by being led to pay more than the worth of the pipe. A person whose property is diminished by a payment of money wrongfully induced is injured in his property." *Id.,* at 396.

See also *Georgia* v. *Evans*, 316 U. S. 159 (1942).

The determinant, then, is whether "property is diminished by a payment of money wrongfully induced." But what was the nature of the injury to property for which recovery was permitted in *Chattanooga?* Clearly it was nothing more than the added expense incurred by the city's treasury as the result of the antitrust violation.

While it was incurred in the course of a business transaction, the *harm* was to the economic wealth of the city's population as a whole, for any savings in public expenditures that ultimately accrued were for their benefit.

This is the same sort of interest sought to be protected here. Hawaii's economy, to which tourism and the tourist trade are important, would be particularly vulnerable to injury from a price conspiracy involving petroleum products. In seeking to preserve the economic opportunities of its people, and the tax revenues generated thereby, Hawaii is asserting an interest not significantly different in concept from that involved in *Chattanooga*. Whether the injury sought to be remedied consists of additional payments from the public purse, as in that case, or the failure to generate additional wealth, as here, the result in either instance.is the same— the government and its population, as entities, have suffered harm to their economic well-being. If that harm is characterized "business or property" in one case, then we stretch no traditional property concepts in applying the same label in the other.*

---

*The Court seems to concede as much in saying that an "injury to the State in its proprietary capacity . . . affects the citizens in much the same way as an injury of the sort claimed by Hawaii here." *Ante*, at 262 n. 14. Yet because the assessment of damages might prove more difficult in a *parens patriae* than a proprietary action, the Court concludes that "the two kinds of injuries are [not] identical in nature." *Id.*, at 263 n. 14. The Court plainly confuses two separate issues. The injury to Hawaii's general economy may present problems of proof not raised in its proprietary action, but a mere difficulty in the assessment of damages cannot change the *nature* of the damage claimed. In short, I think that Hawaii has alleged an injury to its "business or property," and, on the entirely separate question of proving damages, agree with my Brother DOUGLAS that the injury can be quantified, or at least approximated.

This conclusion is not undercut by 15 U. S. C. § 15a, which limits recovery by the United States for injury to its "business or property" caused by a violation of the antitrust laws to "actual damages suffered" "solely as a buyer of goods." S. Rep. No. 619, 84th Cong., 1st Sess., 3 (1955). Nothing in the Act similarly restricts a *State,* suing as *parens patriae.* As the legislative history of § 15a shows, the major emphasis during passage of the Sherman Act was on the methods of its enforcement. "[I]t was believed that the most effective method, in addition to the imposition of penalties by the United States, was to provide for private treble-damage suits. It was originally hoped that this would encourage private litigants to bear a considerable amount of the burden and expense of enforcement and thus save the Government time and money." *Id.,* at 2. Thus private litigants, encouraged by the hope of triple recovery, were seen as a major instrument of antitrust enforcement, supplemented by criminal prosecutions and civil forfeiture actions brought by the Federal Government. These remedies did not, however, adequately protect the Government as the volume of its procurement grew and collusion among its suppliers became increasingly evident. This was the mischief Congress enacted § 15a to curb:

> "The American taxpayer is entitled to full value for his tax dollar. He should be protected against its going into the pockets of wrongdoers in the form of excessive prices and profits gained through violation of the antitrust laws. If he were spending the money himself, he could sue for triple damages. Surely, he is entitled to protection from actual loss where the Government spends it for him. By permitting the United States Government to recover the provable damages resulting from

unlawful practices engaged in by those with whom it does business, [§ 15a] would afford those safeguards necessary to the Public Treasury and at the same time severely deter those who would conspire in their dealings with Federal departments." H. R. Rep. No. 422, 84th Cong., 1st Sess., 4–5 (1955).

At the same time, however, Congress felt that "unlike the situation with respect to private persons, there is no need to furnish the Government any special incentive to enforce the antitrust laws, a heavy responsibility with which it is already charged," and therefore Congress granted "to the Government the right to recover only actual, as distinguished from treble, damages." *Id.,* at 4. In addition, Congress felt that the United States was "amply equipped with the criminal and civil process with which to enforce the antitrust laws. The proposed legislation, quite properly, treats the United States solely as a buyer of goods and permits the recovery of the actual damages suffered." S. Rep. No. 619, *supra,* at 3.

Thus § 15a served a narrower purpose than the treble-damages provisions of the Sherman and Clayton Acts. The United States was "amply equipped" with "criminal and civil process" for general enforcement, and needed a damage remedy solely to protect itself "as a buyer of goods." On the other hand private litigants, including the States, lacked the Government's "criminal and civil process." Yet they were viewed as primary enforcers of antitrust policy and were armed with the weapon of triple recovery as a means of stimulating their efforts. It is plain from the history of § 15a that Congress did not intend the States to be denied the treble-damages remedy Hawaii pursues here.

Finally, this result does not necessarily lead to double recovery. Since Hawaii is by definition asserting claims "independent of and behind the titles of its citizens,"

*Georgia* v. *Tennessee Copper Co.*, 206 U. S. 230, 237 (1907), there may be excluded from its recovery any monetary damages that might be claimed by its citizens individually or as part of a properly constituted class. That problem, like uncertainty of damages, is better answered after trial than on the pleadings.

In sum, I think that since no one questions that Hawaii can maintain a treble-damages action in its proprietary capacity, for analogous reasons, Hawaii may also maintain the action pleaded in count two as *parens patriae*.