**In re WHEAT RAIL FREIGHT RATE ANTITRUST LITIGATION.**

This Document Relates to: Pillsbury Co., No. 82 C 6054; General Mills, Inc., No. 83 C 834; DCA Food Industries, Inc., No. 83 C 835; Pillsbury Co., No. 83 C 1450.

MDL No. 534.

United States District Court, N.D. Illinois, E.D.

Dec. 8, 1983.

See also, D.C., 579 F.Supp. 517.

Richard J. Wegener, Minneapolis, Minn., for Pillsbury.

Ross L. Thorfinnson, Hopkins, Minn., for General Mills.

James R. Scoggin, Hopkins, Minn., for DCA Food Industries.

Laurence Z. Shiekman, Deborah F. Cohen, Philip H. Lebowitz, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for Consol. Rail.

Charles C. Rettberg, Jr., Harry N. Babcock, Paul R. Hitchcock, Rachel E. Geiersbach, Cleveland, Ohio, for Baltimore & Ohio and Chesapeake & Ohio.

## MEMORANDUM OPINION

PRENTICE H. MARSHALL, District Judge.

This memorandum opinion concerns plaintiffs' motions to dismiss counterclaims filed by several of the defendants in these antitrust actions. The defendants ("railroads") are railroads over which the plaintiffs ("shippers") have shipped wheat and wheat products. The railroads [1] allege that

---

1. Counterclaims have been brought by Balti-  more & Ohio Railroad Co., Chesapeake & Ohio

they are among the victims of collusive action by the shippers the goal of which is to increase the shippers' profits, in violation of § 1 of the Sherman Act, 15 U.S.C. § 1 (1976). As alleged in the counterclaims, the shippers have collectively established a "base point pricing" system that enables them to charge "phantom" freight charges to buyers of their products. As described in Consolidated Rail Corporation's counterclaim, the shippers' system uses three midwestern cities, Minneapolis, Kansas City, and Chicago, as origin basing points, and New York City as the delivery basing point for all sales to buyers in the eastern United States. The freight charge to a buyer for a given shipment is based on the current applicable railroad rate from a given origin basing point to New York City, regardless of the actual origin and delivery points of the shipment. Since the shippers pay the railroads a charge based upon the actual origin and delivery points, the shippers collect a "profit" equal to the difference between their actual shipping costs and the prices they charge to the buyers under the base point pricing system.

The shippers have sought to increase their ill-gotten profits further, it is alleged, by conspiring to collectively hold down their freight costs on wheat and wheat products. To explain this we must first briefly discuss the system by which shipping charges for wheat products are determined. The system in effect during the relevant time period was known as the "transit" system. Under this system, a single through rate was applied for shipments of wheat to the miller (the shippers here) and then to the buyer after processing. This was done despite the fact that a given shipment actually stayed at the mill for a period of time while being milled. As best we can tell, a "transit privilege" with respect to a quantity of wheat shipped to the mill was reflected in a "transit bill." Without a transit bill, the shipper could ship its products to a buyer only at a

higher, non-transit rate. The railroads alleged that the shippers entered into an arrangement by which they would exchange transit bills. To illustrate, we use an example supplied by the railroads:

Assume Pillsbury shipped by truck a load of grain into Chicago from a [w]estern elevator. There, Pillsbury had the grain held at an elevator and milled into flour. The outbound "reshipping" rate did not apply on grain trucked into Chicago. Therefore, Pillsbury was entitled to move the flour from Chicago only at the higher "flat" rail rate. Assume General Mills also shipped a load of grain into Chicago, but did so by rail. General Mills also had its flour milled in Chicago. Since the General Mills grain moved into Chicago by rail, General Mills was entitled to the benefit of the lower "reshipping" rate, having exercised its right to stop the grain and have it milled, "in transit." Suppose next that General Mills decided to ship its flour from Chicago by water. General Mills would have no need to use its inbound rail transit billing papers to justify its right to obtain the lower "reshipping" rate. So, General Mills would turn those papers over to Pillsbury who would then use them to "back up" the outbound rail movement.

Thus, Pillsbury would have paid the lower "reshipping" (or proportional) rate instead of the higher "flat" rate it would otherwise have paid absent its agreement with General Mills. In exchange, the counterclaim alleges, Pillsbury agreed to reciprocate on other occasions.... [I]t was a continuing agreement among [the shippers], [the object of which] was to enhance the profitability of the conspirators' overall scheme to maintain supracompetitive profits on bakery flour.

B & O–C & O Memorandum in Response to DCA, General Mills, and Pillsbury Motions to Dismiss Counterclaims at 4–6. Given the concurrent use by the shippers of the

Railway Co., Consolidated Rail Corp., Delaware & Hudson Railway Co., and Grand Trunk Western Railroad Co. in 82 C 6054 and 83 C 1450,

and by Baltimore & Ohio, Chesapeake & Ohio, and Consolidated Rail in 83 C 834 and 83 C 835.

base point pricing system, any time a shipper could keep its transit costs down it increased its profits.[2]

The shippers' alleged conspiracy to hold down freight costs also took other forms. The railroads allege that the shippers directed the railroads to engage in circuitous routings, which, under the ICC-approved freight rate system apparently lowered the shippers' freight costs in some cases. The railroads also assert that the shippers filed documents with the ICC that omitted material information in an attempt to encourage the ICC to maintain the existing rate and transit system. The railroads further claim that the shippers exchanged information concerning delivered prices and the availability of transit bills in furtherance of their scheme. Finally, the railroads aver that the shippers conspired to sell products which would have had higher rail freight charges locally (apparently not using the rails) while using the rails to ship shipments with lower freight charges.

■ The shippers have moved to dismiss the counterclaims, alleging that they fail to state a claim on which relief may be granted and that the railroads do not have "antitrust standing" to bring the claims.

When the present motions to dismiss were filed, nothing suggested that the railroads were purchasers of wheat products subject to the base point pricing system. Thus, the shippers pointed out that to the extent that the railroads' counterclaims were aimed at that system alone, the railroads were harmed only indirectly and that the only proper plaintiffs to raise such a claim would be the buyers themselves. We agree. See *Associated General Contractors v. California State Council of Carpenters,* —— U.S. ——, 103 S.Ct. 897, 908–13, 74 L.Ed.2d 723 (1983) (person not a consumer or competitor in the market in which trade was restrained cannot bring antitrust claim). In their responses to the

motions the railroads disavowed any intention to attack the base point pricing system. They pointed out, however, that they were buyers of wheat products, and some of the railroads have amended their counterclaims to add a second count based on that state of affairs. In the present motions, however, since the railroads in their original counterclaims did not allege that they were buyers of wheat products, the sufficiency of any claim arising from the purchase of such products is not before us, and we assume that the claims subject to the motion to dismiss are based solely upon alleged injury to the railroads as carriers of wheat products.

Under section 4 of the Clayton Act, 15 U.S.C.A. § 15 (West Supp.1983), any person injured in his business or property by reason of anything forbidden by the antitrust laws may bring an action under those laws to recover his damages. The courts have, however, limited the broad scope of § 4 in an effort to confine the class of proper antitrust plaintiffs to those whom Congress intended to permit to sue. The parties agree that the standard for "antitrust standing" is stated in *Associated General Contractors v. California State Council of Carpenters,* —— U.S. ——, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). In that case, the Court noted that the threshold inquiry is whether the plaintiff alleges a causal connection between an antitrust violation and harm to the plaintiff. *Id.* at 908. An affirmative answer to that question, however, does not end the inquiry. The Court has identified factors that "circumscribe and guide the exercise of judgment in deciding whether the law affords a remedy in specific circumstances." *Id.* Among those factors are: whether the defendant intended to cause harm to the plaintiffs; whether the plaintiff is a consumer or competitor in the market in which trade is alleged to have been restrained; whether the plaintiff's alleged injury was a direct

---

**2.** Freight rates might increase while a given shipment was being milled. If the shipment had transit privileges, the earlier and lower rate applied to the reshipment to the eventual buyer. One alleged effect of the trading of transit privi-

leges was to deprive the railroads of intervening increases in rates as to shipments that would not otherwise have enjoyed the "reshipping" rates.

result of the antitrust violation;[3] whether the alleged injury is speculative; and whether there is a risk of duplicative recoveries or a need for complex apportionment of damages if this plaintiff is permitted to sue. *Id.* at 908–12.

Putting aside the railroads' allegation of a conspiracy by the shippers to establish a base point pricing system for buyers of milled wheat products, the railroads have met the standard set forth in *Associated General Contractors.* Their claim involves a conspiracy alleged to be directed purposefully at them that deprives them of freight revenues that they would receive absent the conspiracy; they are competitors in the market in which trade was restrained, that is, the market for the purchase of rail freight services; though proof of the exact measure of damages may involve difficult concepts, the fact of damage is not speculative if the railroads' allegations are true;[4] and apart from certain considerations that we will discuss below, there is no risk of complex apportionment or duplicative recovery.

The only serious "standing" problem we perceive is caused by the railroads' "background" allegation of a conspiracy to establish a base point pricing system. The shippers suggest that the conspiracy to hold down freight charges, even if it exists, is entirely subordinate to the alleged base point pricing conspiracy. If the shippers were charging their buyers the actual freight charges paid to the railroads, the argument goes, there would be no incentive to maintain a "spread" and thus no incentive to hold down freight charges. Though an individual shipper would have an incentive to hold its freight charges down so as to increase its sales, the shippers as a group would have no incentive to hold freight costs down collectively.

We do not agree with the shippers' argument. There are several reasons why the shippers might want to hold down freight costs even absent a base point pricing system. For example, the shippers might wish to gain a competitive advantage over other shippers using means of transit other than the rails by keeping down the freight costs passed on to buyers. Likewise, the shippers in the conspiracy might wish to gain a similar advantage over other shippers using the railroads but which were not part of the "favored" group. The shippers might also want to keep freight costs down to avoid having buyers switch to substitutes and to combat foreign competition. Thus, at least on the present record we cannot say that the alleged conspiracy to hold down the charges paid to railroads is entirely dependent on the allegation that the shippers conspired to establish a base point pricing system.

Even were we to accept the shippers' argument, the fact that an unlawful conspiracy may be part of a broader scheme does not in itself bar a suit by one injured by the subordinate conspiracy. *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982), was a similar case. In *Blue Shield,* the plaintiff, a patient of a clinical psychologist, alleged that defendant, a health insurer, had conspired with psychiatrists to bar reimbursement of patients for services performed by clinical psychologists. The plaintiff was injured to the extent of her out of pocket payments to her psychologist, which she could not recover through her insurance with Blue Shield. Blue Shield

---

**3.** As part of the "directness" inquiry, if there exists an identifiable class of persons who may be expected to sue and whose injury is more direct than plaintiff's, the justification for permitting a more "remote" plaintiff to sue is diminished. *Associated General Contractors,* 103 S.Ct. at 909.

**4.** "'Difficulty of ascertainment [should not be confused] with right of recovery.'" *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 475 n. 11, 102 S.Ct. 2540, 2547 n. 11, 73 L.Ed.2d 149 (1982)

(quoting *Bigelow v. RKO Radio Pictures,* 327 U.S. 251, 265, 66 S.Ct. 574, 580, 90 L.Ed. 652 (1946)). The injury alleged by the railroads is tangible, and it does not rest on an abstract conception or speculative measure of harm. The measure of damages will be the difference between freight charges absent the conspiracy and the actual freight charges paid by the shippers. This is similar to the measure employed in garden variety price fixing cases.

argued that since the conspiracy was directed at psychologists, a consumer of psychologists' services did not have antitrust standing to sue. The Court rejected this allegation, holding that since plaintiff's injuries flowed directly from "that which [made] defendants' acts unlawful," *id.* at 484, 102 S.Ct. at 2551, the fact that the overall conspiracy was directed at someone other than her did not bar her claim. Similarly, in the present case, even if the base point pricing conspiracy exists, to the extent that the railroads' injury is separable from that of the buyers, the fact that the shippers may have been trying to increase their margin at both ends does not mean that only those injured at one end can sue.

A potentially more serious problem is posed by the apparent danger of duplicative recovery. To illustrate, suppose that in a given instance, the freight charge to a buyer as a result of the base point pricing system is 20. Suppose further that the actual freight charge, that is, the amount paid to the railroad by the shipper, is 10. On the other side, suppose that the railroad could show that absent the shippers' conspiracy to manipulate and hold down freight charges it would have received 15 for the same shipment. If both the buyer and the railroad were to sue the shipper, and both were to prevail, the shipper would end up paying the buyer 10 and the railroad 5. *See Chattanooga Foundry & Pipe Works v. Atlanta*, 203 U.S. 390, 27 S.Ct. 65, 51 L.Ed. 241 (1906) (damages for sellers' price fixing conspiracy measured by difference between agreed price and price that would have prevailed absent the illegal conduct); *American Crystal Sugar Co. v. Mandeville Island Farms, Inc.*, 195 F.2d 622, 625 (9th Cir.) (damages for buyers' conspiracy to fix prices at which goods

are sold to them measured by difference between amount actually realized by sellers and amount they would have received absent the conspiracy), *cert. denied*, 343 U.S. 957, 72 S.Ct. 1052, 96 L.Ed. 1357 (1952). In a sense, therefore, if both conspiracies exist, their victims would be "asserting conflicting claims to a common fund," *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 730, 97 S.Ct. 2061, 2066, 52 L.Ed.2d 707 (1977), since the damages resulting from the two-headed conspiracy would overlap, in the example, by 5.[5]

One difference between this case and *Illinois Brick*, in which indirect purchasers of goods were barred from suing price fixers, and *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 264, 92 S.Ct. 885, 892, 31 L.Ed.2d 184 (1972), in which a state was barred from recovering for injuries to its "general economy" caused by antitrust violations since those injuries were merely reflective of injuries directly caused to consumers in the state, is that here both sets of "victims" were directly harmed. In both *Illinois Brick* and *Hawaii v. Standard*, proof by the indirectly harmed plaintiff of an antitrust violation necessarily would have entailed proof of the antitrust violation that injured the directly harmed potential plaintiff. In the present case, by contrast, at trial the railroads will not necessarily wish to multiply the proceedings by introducing evidence of a base point pricing conspiracy against buyers (except to the extent that they are permitted to maintain a claim as buyers themselves), and the shippers certainly will not wish to introduce evidence of such a conspiracy, for fear that they would be estopped from relitigating the issue in a later suit by the buyers.[6]

**5.** The railroads have not suggested that the shippers would be able to set off against their buyers amounts paid to or potentially owed to the railroads under a theory that the "price that would have prevailed absent the illegal conduct" would not be the price actually paid to the railroads absent the conspiracy to manipulate freight charges. We would find such a suggestion somewhat difficult to swallow, since the railroads' damage results from different conduct than the shippers' damage.

**6.** To the extent that the railroads now intend to pursue an antitrust claim as buyers of wheat, there is a potential danger that they could recover twice for the same injury, once as victims of the "manipulation" conspiracy and once as victims of the base point pricing conspiracy. This can be remedied easily. If the railroads prevail at trial on both claims, we can bar them from recovering "as railroads" with respect to any shipment for which they are entitled to recover

Indeed, had the railroads not mentioned the base point pricing conspiracy in their original counterclaims the danger of duplicative recovery in all likelihood would not have come to our attention, for the shippers would have feared application of judicial or collateral estoppel had they raised the point. Though we recognize that under some circumstances allegations made in pleadings may be considered as evidentiary admissions, *see, e.g., Douglas Equipment Co. v. Mack Trucks, Inc.,* 471 F.2d 222, 224 (7th Cir.1972), in the present situation it is entirely speculative to presume that a base point pricing conspiracy exists that is unlawful under the antitrust laws. Since proof of the conspiracy alleged by the railroads to hold down freight charges does not carry with it proof of the base point pricing conspiracy, at least at present we do not think that the counterclaim should be dismissed due to the potential of overlapping recovery. The motions to dismiss for lack of antitrust standing are therefore denied.

■ Some but not all of the shippers have challenged the legal sufficiency of the allegations of an unlawful conspiracy. The tenor of most of the arguments made by the shippers that have challenged the sufficiency of the counterclaims is that since freight tariffs are established by the railroads themselves (as approved by the ICC), any injury to the railroads alleged to have been caused by "manipulation" of the tariffs is a result of the railroads' own tariffs and not anything the shippers are alleged to have done. While this argument has some surface appeal, it does not withstand analysis, at least in the context of a motion to dismiss for failure to state a claim.

As noted earlier, the alleged conspiracy involved directing the railroads to engage in circuitous routings, which is alleged to have caused the railroads to incur increased costs and car supply problems; exchanging information concerning the avail-

ability of transit bills; exchanging transit bills; selling products locally that would have required higher shipping charges combined with the rail shipment of products that required lower shipping charges; and submitting false and/or misleading filings to the ICC in an effort to persuade that body to maintain the "transit" system.

We agree with the shippers that at least at first blush, it is conceptually difficult to fit the railroads' claim within the rubric of price fixing, since "prices" as such were established by the railroads' tariffs. What the railroads actually allege is not that the shippers fixed prices in the sense that they got together and told the railroads what they would agree to pay for freight but rather that they combined to take advantage of the railroads' tariff system to the fullest extent possible. However, to say that the alleged conspiracy did not involve price fixing is not to say that it did not involve conduct prohibited by the Sherman Act. Other conspiracies to restrain trade are barred as well, though the analysis is sometimes different from that used in a price fixing case. Thus, while the shippers' conduct may not have been *per se* unlawful,[7] it may nevertheless be prohibited under the familiar "rule of reason" test:

The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise ob-

"as buyers." This does not implicate the concern with complex theories of apportionment raised by the Court in *Illinois Brick,* 431 U.S. at 731–32, 97 S.Ct. at 2067.

7. Since this issue is not directly presented by the shippers' motions, we do not decide it here. We simply characterize the shippers' conduct as not *per se* unlawful for the purpose of analysis.

jectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences. *Board of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 243, 62 L.Ed. 683 (1918).

Therefore, construing the railroads' claims as alleging that the shippers conspired to act in a way in which they would not have acted had they been conducting themselves as independent economic actors in a competitive market, they have stated a claim under the Sherman Act. Notwithstanding the shippers' arguments to the contrary, an organized system to exchange transit bills is not a "necessary consequence" of the railroads' tariff system. If the railroads can prove that the organized exchange restrained trade and did so unreasonably, they may succeed on their antitrust claim. If so, the alleged exchange of information relating to available transit bills may well have been an unlawful act in furtherance of the conspiracy.

The allegations relating to "circuitous routing" and "local sale" are at best considerably weaker than those relating to transit bills. If it is cheaper for a shipper to use a circuitous routing permitted by the railroads' tariff system and/or to sell some products locally, the shipper has an obvious economic incentive to do those things even if acting alone. It is difficult to see how an agreement by several competitors to do what each of them would have done individually can be a "restraint" of trade. Nevertheless, in the present context we cannot preclude the possibility that the railroads will be able to show that the result of the conspiracy is that shippers have altered what would be considered normal competitive behavior.

■ Finally, the shippers argue that their conduct before the ICC is protected from antitrust scrutiny by the doctrine of *Eastern Railroad Presidents' Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127,

81 S.Ct. 523, 5 L.Ed.2d 464 (1961) and *United Mine Workers of America v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). However, in *Noerr,* the Supreme Court suggested that activity "ostensibly directed toward influencing governmental activity [that is] a mere sham" might be subject to the Sherman Act. *Noerr,* 365 U.S. at 144, 81 S.Ct. at 533. In *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 513, 92 S.Ct. 609, 613, 30 L.Ed.2d 642 (1972), the Court stated that "[m]isrepresentations, condoned in the political arena, are not immunized when used in the adjudicatory process."[8] *See also, e.g., Federal Prescription Service, Inc. v. American Pharmaceutical Association,* 663 F.2d 253, 262–63 (D.C.Cir. 1981) (proof that defendants combined to subvert integrity of governmental process or effectively barred opponents' access to that process would be sufficient to state antitrust claim), *cert. denied,* 455 U.S. 928, 102 S.Ct. 1293, 71 L.Ed.2d 472 (1982); *Israel v. Baxter Laboratories, Inc.,* 466 F.2d 272, 275–80 (D.C.Cir.1972) (allegation that purpose of defendants' joint efforts was to preclude fair consideration by Food and Drug Administration of plaintiffs' drug falls within "sham" exception to *Noerr-Pennington*). The railroads' allegation that the shippers made material omissions from their ICC filings is sufficient to survive the shippers' motion to dismiss.

To summarize, plaintiffs' motions to dismiss defendants' counterclaims (motions 4 and 20 on the parties' joint list) are denied. Plaintiffs are to answer the counterclaims within 20 days of entry of this order.

---

**8.** Neither the shippers nor the railroads have discussed whether ICC proceedings concerning ratemaking are "adjudicatory," and we do not think that resolution of that issue is critical here.