ALASKA TEAMSTERS LOCAL
959, Plaintiff,

v.

ATLANTIC RICHFIELD COMPANY, Arco Alaska, Inc., Sohio Alaska Petroleum Co., and Sohio Petroleum Company, Defendants.

CANADIAN CONFERENCE OF
TEAMSTERS, Plaintiff,

v.

ATLANTIC RICHFIELD COMPANY, et al., Defendants.

ALASKA TEAMSTERS LOCAL
959, Plaintiff,

v.

ATLANTIC RICHFIELD COMPANY, et al., Defendants.

Archie MacDONALD, et al., Plaintiffs,

v.

ATLANTIC RICHFIELD COMPANY, et al., Defendants.

Nos. A83–171 CIV to A83–173 CIV
and A84–322 CIV.

United States District Court,
D. Alaska.

Aug. 22, 1985.

William A. Brockett, Keker & Brockett, San Francisco, Cal., Jack R. Ormes, Ormes & Associates, Los Angeles, Cal. (argued), William Bittner, Birch, Horton, Bittner, Monroe, Pestinger & Anderson, Anchorage, Alaska, for plaintiffs.

Ronald L. Olson, Jeffrey I. Weinberger, Munger, Tolles & Richershauser, Los Angeles, Cal. (argued), Stephen C. Hillard, Munger, Tolles & Richershauser, John A. Reeder, Sohio Petroleum Co., Anchorage, Alaska, for defendants.

## MEMORANDUM AND ORDER

FITZGERALD, Chief Judge.

In this group of cases,[1] now before the court on defendants' motions to dismiss, plaintiffs Teamster unions and individual union members[2] claim that defendants[3]

---

1. As will be explained in greater detail shortly, five cases currently comprise this litigation. Only four of the suits currently contain outstanding motions to dismiss.

2. Two different affiliates of the Teamsters have brought actions here. They are Local 959 of the Alaska Teamsters and the Canadian Conference of the Teamsters Union (plaintiffs in case numbers 83–171, 83–172 and 83–173). In addition,

("the oil companies") have violated the antitrust laws as well as the Racketeer Influenced and Corrupt Organizations Act ("RICO").[4] Defendants use truck transportation companies to ship supplies to their oil production operations in the northern reaches of the State of Alaska ("the North Slope"). Plaintiffs allege that these statutory violations arose out of conspiracy entered into between the oil companies to manipulate and fix the rates for truck transportation to the North Slope and to boycott union-affiliated truck transportation companies. Local 959 complains that its ability to represent its members in collective bargaining has been damaged and that the union has suffered monetary loss as a result of these alleged activities. Plaintiff seeks treble damages provided under the antitrust laws and injunctive relief.

It is axiomatic that a complaint should not be dismissed unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."[5] "This rule applies with no less force to [an antitrust] claim."[6] Following a review of the allegations brought in case numbers 83–171 and 83–172, I am compelled to conclude, however, that under the principles set forth in the Supreme Court's recent decision in *Associated General Contractors v. Carpenters,*[7] plaintiffs can prove no set of facts demonstrating they are entitled to relief under the antitrust laws, and their complaints seeking such relief must, therefore, be dismissed. A discussion setting forth the reasons why I have reached this conclusion follows.

The Supreme Court's recent benchmark RICO decision in *Sedima, S.P.R.L. v. Imrex Co.,* —— U.S. ——, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985), led this court, like many other lower courts, to stay consideration of plaintiffs' RICO claims pending the Court's resolution of this important case. My determination of defendants' motions to dismiss plaintiffs' RICO claims, brought in case numbers 83–172, 83–173 and 84–322, will follow in a separate memorandum and order.

## I. THE COMPLAINTS

Alaska Teamsters Local 959 is the only plaintiff in case number 83–171.[8] According to its third amended complaint, Local 959 is the collective bargaining agent for over two thousand truckers employed throughout the State of Alaska. Its members include individual owner-operators of truck transportation concerns, as well as truckers, warehousemen, mechanics, office workers and maintenance technicians employed by truck transportation companies which have union shops in Alaska (Paragraph 19).

In paragraphs 22 to 27 of Local 959's complaint, the union alleges the factual basis for its claim that defendant oil companies violated the antitrust laws. Para-

---

ten individual members of Local 959 bring suit in their own capacities in case numbers 84–318 and 84–322.

**3.** Atlantic Richfield Company, Arco Alaska, Inc., Sohio Alaska Petroleum Co. and Sohio Petroleum Company are defendants in all five suits. Sohio Construction Company is also a defendant in case numbers 83–171, 84–318 and 84–322. Only case number 84–322 has non-corporate defendants.

**4.** 18 U.S.C. §§ 1961–1968 (1982).

**5.** *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957).

**6.** *McLain v. Real Estate Bd. of New Orleans, Inc.,* 444 U.S. 232, 246, 100 S.Ct. 502, 511, 62 L.Ed.2d 441 (1980).

**7.** 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983).

**8.** The Canadian Conference's amended complaint is almost identical to that of Local 959. The only significant difference is the Conference's addition of a purported RICO cause of action, whose propriety shall be considered in a separate memorandum. In now considering whether these unions have sufficiently stated antitrust claims upon which relief may be granted, the court shall therefore treat these complaints interchangeably, citing to Local 959's third amended complaint solely for ease of reference.

graph 22 alleges generally that "[s]ince on or about January 1, 1978, and continuing to date, defendants, and each of them, have entered into a conspiracy with each other and with other non-defendant co-conspirators ... to restrain trade, to fix prices, and to enter into an illegal group boycott." The union characterizes such non-defendant co-conspirators to include "non-union truck transportation companies and non-union-member owner-operators." *Id.* The targets of these alleged activities were "Local 959, union-affiliated truck transportation companies and union-member owner-operators shipping products, supplies and equipment to the North Slope." (Paragraph 23).

According to paragraph 25 of the complaint, the oil companies' alleged conspiracy had two primary objects. It is said that:

(a) Defendants conspired to attempt to manipulate and fix, and did illegally manipulate and fix the rates set for truck transportation of products, equipment and supplies to the North Slope in furtherance of their anticompetitive scheme to restrain and eliminate competition in the relevant markets; and

(b) Defendants conspired to boycott union-affiliated truck transportation companies, including union-member owner-operators, by refusing to award business to them for the transportation of products, equipment and supplies to the North Slope using truck transportation, in furtherance of their anticompetitive scheme to restrain and eliminate competition in the relevant markets.

Paragraph 27 of Local 959's complaint sets forth a litany of illegal activities allegedly conducted by the oil companies in pursuing their claimed boycott of union-affiliated truck transportation companies and union-member owner-operators. Among other things, the union claims that:

(a) Defendants refused to award contracts to union-affiliated truck transportation companies and individual owner-operators for shipment of products, equipment and supplies to the North Slope, even though such companies and operators offered their services at competitive prices, or offered services which cost marginally more but were otherwise preferable to rate and services of non-union operations;

(b) Defendants threatened union-affiliated truck transportation companies and individual owner-operators with cancellation or withholding of contracts to ship products, equipment and supplies to the North Slope, unless such companies pledged to convert themselves into non-union companies;

(c) Defendants aided and abetted the operations of non-union "private corporation" truck transportation operations which defendants knew or should have known were incorporated and operated in direct violation of Alaskan state law; ...

(f) Defendants awarded contracts and business to truck transportation companies which have been prominent in anti-union activities. Such conspiratorial award of contracts and business to these companies has not been based upon commercial economic considerations or sound business judgment, but has been based on Defendants' desire to enforce their boycott of union-affiliated truck transportation companies and individual owner-operators; ...

(h) Defendants advocated, encouraged and induced, by threats and promises, non-union truck transportation companies to refuse to enter into collective bargaining agreements with Local 959; and

(i) Defendants advocated, encouraged and induced, by threats and promises, suppliers of products, equipment and supplies, and contractors and sub-contractors purchasing products, equipment and supplies for use on the North Slope, to refuse to hire union-affiliated truck transportation companies and individual owner-operators for shipments to the North Slope ...

Paragraph 35 describes the alleged "purpose and effect" of these activities: first, "to weaken, destroy, and restrain the trade of union-affiliated truck transportation

companies and individual owner-operators;" second, to injure Local 959's ability to effectively represent its members in collective bargaining; and, finally, "to weaken, destroy and restrain competition for labor services in the relevant markets."

Local 959 claims that these alleged antitrust violations caused it in excess of $20 million in damages. The complaint does not identify precise components of these alleged damages. However, the following harms are claimed: (1) the termination of the collective bargaining relationship between Local 959 and certain previously unionized truck transportation companies doing business in the North Slope (Paragraph 30); a reduction of the "aggregate market share" possessed by unionized truck transportation companies in the "relevant markets" and a decline in the number of employed members of Local 959 (Paragraph 31); and, finally, lost revenues received by Local 959 due to reduced union initiation fees and dues and diminished truck transportation company payments to union health and welfare, pension, and apprenticeship programs (Paragraph 32). Local 959 seeks injunctive relief under section 16 of the Clayton Act, 15 U.S.C. § 26, as well as treble damages under section 4 of the Clayton Act, 15 U.S.C. § 15.

## II. DISCUSSION

■ In 1970, a district court observed: "We must confess at the outset that we find antitrust standing cases more than a little confusing and certainly beyond our powers of reconciliation."[9] The court's confusion is not surprising, for application of standing principles has been particularly difficult in the antitrust area. Courts have never read sections 4 and 16 of the Clayton Act[10] literally to allow treble damages and/or injunctive relief to every plaintiff able to attribute an actual or threatened economic loss to an antitrust violation.[11] This unwillingness to recognize every such injury is fully consistent with the essential principle of antitrust law: that the antitrust laws protect competition as a whole, not individual competitors.[12]

### A. AGC

Notwithstanding Local 959's arguments to the contrary, the Supreme Court's recent decision in *Associated General Contractors*[13] (hereinafter "AGC") refined and reaffirms these essential principles of antitrust law.[14] Because I have found the result of *AGC* to be dispositive of the motions now before me, a thorough review of

**9.** *Wilson v. Ringsby Truck Lines,* 320 F.Supp. 699, 701 (D.Colo.1970).

**10.** Section 4 of the Clayton Act provides in relevant part:
[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefore ... and shall recover three-fold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee. 15 U.S.C. § 15 (1982).
Section 16 of the Act concerns equitable relief, stating in relevant part:
Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief ... against threatened loss or damage by a violation of the antitrust laws ... when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings.

**11.** *See In re Multidistrict Vehicle Air Pollution,* 481 F.2d 122, 125 (9th Cir.) ("Read literally,

[section 4] could afford relief to all persons whose injuries are causally related to an antitrust violation. Recognizing the nearly limitless possibilities of such an interpretation, however, the judiciary quickly brushed aside this construction."), *cert. denied,* 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973).

**12.** *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977).

**13.** 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983).

**14.** In attempting to get out from under the holding in *AGC,* Local 959 argues, *inter alia,* that AGC was an *ad hoc* "fact bound" decision which established "no bright-lines eliminating standing" for Local 959. *See* Plaintiffs' Opposition to Defendants' Motion to Dismiss [corrected] (filed June 6, 1983) (hereinafter cited as Plaintiff's Opposition) at 204. I reject this characterization of the Court's decision in *AGC,* as my discussion of this case will demonstrate *infra.*

the facts and holding of that decision is appropriate.

The plaintiffs in *AGC*, the California State Council of Carpenters and the Carpenters 46 Northern Counties Conference Board (*AGC* union plaintiffs), were affiliated unions of a larger, umbrella union, the United Brotherhood of Carpenters and Joiners of America, AFL–CIO. These union affiliates represented more than 50,000 individuals employed by the defendant employer group, the Associated General Contractors of California, Inc. (the association), in the carpentry, drywall, piledriving, and related industries throughout the State of California. The named defendants were the association, approximately 250 members of that construction contractors organization identified individually, and 1,000 unidentified co-conspirators.

The union plaintiffs and the defendants in *AGC*, and their predecessors, had been parties to collective-bargaining agreements governing the terms and conditions of employment in construction-related industries in California for over 25 years. The wages and other benefits paid pursuant to these agreements amounted, at the time of the litigation, to more than $750 million per year.

In their complaint in *AGC*, plaintiffs' most specific factual allegations related to their labor relations with the defendant contractor association. The unions claimed that the contractor association conspired to abrogate and weaken the long-established collective-bargaining relationship between themselves and the signatory employers of the association. The alleged "purpose and effect" of these activities was two-fold: first, "to weaken, destroy, and restrain the trade of certain contractors," who were either members of the contractors association or who had signed agreements with plaintiffs; and second, to restrain "the free exercise of the business activities of plaintiffs . . . ."

Plaintiffs claimed these alleged antitrust violations caused them damages that approximated those now claimed by the union plaintiffs before me: around $25 million. Their amended complaint, like Local 959's complaints in the present case, failed to identify specific components of their damages claim. Nor did the unions in *AGC* seek injunctive relief under § 16 of the Clayton Act, 15 U.S.C. § 26, as Local 959 has done in the complaints filed here.

The District Court in *AGC* dismissed plaintiffs' federal antitrust claim. The court observed that the complaint alleged "a rather vague, general conspiracy," and that the allegations "appear typical of disputes a union might have with an employer," which in the normal course are resolved by grievance and arbitration or by the NLRB.[15]

On appeal the Ninth Circuit Court of Appeals reversed the District Court's dismissal of the unions' federal antitrust claim.[16] In support of the plaintiff unions' standing, the majority reasoned that these organizations were within the area of the economy endangered by a breakdown of competitive conditions, not only because injury to them was a foreseeable consequence of the antitrust violation, but also because that injury was specifically intended by the defendants.[17]

On certiorari to the Supreme Court the decision of the Court of Appeals was reversed, holding that the District Court had properly dismissed the unions' amended complaints because the unions lacked standing to bring the action under the antitrust laws.[18]

Although the Supreme Court expressly refrained from formulating any "black letter" rule precluding all labor unions from bringing antitrust actions, it noted that "a union, in its capacity as a bargaining representative, will frequently not be part of the class the Sherman Act was designed to

---

15. 404 F.Supp. 1067, 1069 (N.D.Cal.1975).

16. 648 F.2d 527 (9th Cir.1980).

17. *Id.* at 538.

18. 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983).

protect, especially in disputes with employers with whom it bargains." Citing its earlier decision in *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,[19] the Court reminded that "[i]n each [antitrust] case [plaintiff's] alleged injury must be analyzed to determine whether it is of the type that the antitrust statute was intended to forestall." In *AGC*, the Court found that the unions' labor-market interests predominated, and that the *Brunswick* requirement that the claimed injuries be the kind Congress intended to prevent through passage of the Sherman Act was not met.[20]

In addition to emphasizing that the *AGC* unions had not alleged the type of injuries which came under the umbrella of antitrust law protection, the Court underscored the fact that the union plaintiffs were "neither a consumer nor a competitor in the market in which trade was restrained." Nor had the unions alleged that either output had been curtailed or prices enhanced throughout an entire competitive market. The

Court noted that the primary goal of all unions is to enhance the earnings and improve the working conditions of their membership, and "that goal is not necessarily served, and indeed may actually be harmed, by uninhibited competition among employers striving to reduce costs in order to obtain a competitive advantage over their rivals."

Although the Court did not set forth an exact "antitrust standing" test which must be applied to all antitrust litigation, it stated that all such lawsuits require a tripartite standing analysis which considers the following: (a) the harm suffered by the plaintiff; (2) the alleged wrongdoing by the defendants; and (3) the relationship between them.[21] In applying this standing analysis to the facts before it in *AGC*, the Court found that the nature of the harm likely suffered by the unions (e.g. diminished dues payments) was not the type of injury historically protected by the antitrust laws.[22] Moreover, the chain of causa-

**19.** 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977).

**20.** In *Brunswick*, the Court found it "inimical" to the purposes of the antitrust laws to award damages for the type of injury claimed by plaintiff: lost profits due to defendant's bail-out of financially-strapped competitors, an act which *promoted* competition. In so finding, the Court noted that Congress enacted the antitrust laws for "the protection of *competition*, not *competitors*." 429 U.S. at 488, 97 S.Ct. at 697 (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962)).

**21.** In a footnote, the Court pointed out that the scope of antitrust standing is narrower than that of so-called constitutional standing:

The label "antitrust standing" has traditionally been applied to some of the elements of this inquiry. As commentators have observed, the focus of the doctrine of "antitrust standing" is somewhat different from that of standing as a constitutional doctrine. Harm to the antitrust plaintiffs is sufficient to satisfy the constitutional standing requirement of injury in fact, but the court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action.

459 U.S. at 535 n. 31, 103 S.Ct. at 907 n. 31; *see also Bubar v. Ampco Foods, Inc.*, 752 F.2d 445, 448 (9th Cir.1985).

**22.** Unlike the complaints in the instant cases, those of *AGC* neglected to specify the nature of

plaintiffs' alleged harm. The Court therefore was required to speculate in a footnote about the likely injury suffered by the unions. Importantly for the purposes of my analysis of the instant complaints, however, the Court stated that such union harms as losses in dues receipts or diminished opportunities to organize previously nonunion firms are remote and indirect, flowing out of the harm suffered by unionized subcontractors and the resultant losses suffered by union members. Essentially engaged in a "proximate cause" analysis, the Court wrote:

Because of the absence of specific allegations, we can only speculate about the specific components of the Union's claim. If the Union asserts that its attempts to organize previously nonunion firms have been frustrated because nonunion firms wish to continue to obtain business from those subjected to coercion by the defendants, its harm stems most directly from the conduct of persons who are not victims of the conspiracy (citation omitted). If the Union claims that dues payments were adversely affected because employees had less incentive to join the Union in light of expanding nonunion job opportunities, its damage is more remote than the harm allegedly suffered by unionized subcontractors. The same is true if the Union contends that revenues for dues payments declined because its members lost jobs or wages because their unionized employers lost business. That harm, moreover, is even more indirect than the already indirect injury to its members, yet a number

tion between the unions' apparent injury and the alleged wrongdoing by the defendant contractors association, that of restraining the market for construction subcontracts, resulted in only "indirect" harm to the unions. The direct victims of the defendants' improper activities, who, according to the Court, would face no such hurdles to antitrust standing themselves, were the contractors and subcontractors being directly pressured by the contractors association to limit their business to non-union firms.

In concluding that the *AGC* unions' antitrust allegations were insufficient as a matter of law, the Court also cited other "relevant" factors which supported defendants' claim that these unions lacked standing to sue.[23] In addition to the paramount issue of the nature of the unions' injury, these factors included: "the tenuous and speculative character of the relationship between the alleged antitrust violation and the [unions'] alleged injury;" "the potential for duplicative recovery or complex apportionment of damages;" and "the existence of more direct victims of the alleged conspiracy."[24] Finding that all these factors, when applied to the factual allegations in *AGC*, "weigh[ed] heavily against judicial enforcement of the [unions'] antitrust claim,"[25] the Supreme Court held the District Court was correct in concluding that the unions lacked standing to bring antitrust causes of action.

The substance of Local 959's claims of harm resulting from the conduct of the North Slope oil producers is, at first blush, remarkably similar to the claims made by the carpenters' union in *AGC*. To begin with, the breadth of Local 959's complaint is devoted to allegations which describe how the union's labor market interests have been harmed; thus, the union's injury in this case, like that of the union in *AGC*, appears to be a predominately labor-market injury not meant to be protected by the antitrust laws. Local 959's allegations of harm further make clear that the union, like those in *AGC*, was neither a direct consumer nor a competitor in the relevant markets affected by the conspiracy. A perusal of the allegations also suggests that any harms suffered by the union have, like those suffered by the unions in *AGC*, been only indirectly linked to the claimed conspiracy; more direct victims would appear to exist to ensure effective enforcement of the antitrust laws. Finally, the nature of Local 959's damages claim appears to share the very problems the Supreme Court held surrounded the unions' damages in *AGC*: complexity, indirectness, speculativeness, and the risk of multiple recovery. These similarities will be discussed in depth in the context of this court's review of Local 959's arguments.

Local 959 attempts to distinguish the holding in *AGC* by arguing, *inter alia*, that (1) the success of the oil companies' alleged conspiracy to injure Local 959 leaves the direct victims of the improper behavior (i.e. the once union-affiliated trucking companies) "in the enemy camp," transforming Local 959 into the proper and necessary party to bring these actions;[26] (2) unlike the *AGC* unions, Local 959 has alleged the type of harm that the antitrust laws were designed to prevent;[27] (3) injury to Local 959 was an integral part of the oil companies' alleged scheme to eliminate competition in the "labor services market;"[28] (4) the damages in this case are

---

of decisions have denied standing to employees with merely derivative injuries.
459 U.S. at 541 n. 46, 103 S.Ct. at 910 n. 46 (citations omitted).

**23.** *Id.* at 545, 103 S.Ct. at 912.

**24.** *Id.*

**25.** *Id.*

**26.** Plaintiffs' Opposition, *supra* note 14, at 2.

**27.** *Id.* at 21–27.

**28.** Plaintiffs' Supplemental Memorandum in Opposition to Motion to Dismiss (filed Dec. 7, 1983) (hereinafter cited as Plaintiffs' Second Opposition) at 305; Plaintiffs' Third Supplemental Memorandum in Opposition to Motion to Dismiss (filed Feb. 25, 1982) (hereinafter cited as Plaintiffs' Third Opposition) at 208; Plaintiffs' Fourth Supplemental Memorandum in Opposition to Motion to Dismiss (filed March 13, 1985) at 4.

"hard-edged, and far easier to measure than the speculative damages which were sought in *AGC*;"[29] (5) the post-*AGC* decision of *Ostrofe v. H.S. Crocker Co., Inc.*,[30] proves the validity of Local 959's claim of antitrust standing;[31] and, finally (6) unlike the *AGC* union plaintiffs, Local 959 seeks more broadly available injunctive relief as well as treble damages.[32] These attempts to pull Local 959's complaint out from under the clear mandates of *AGC* fall short, however. Each shall now be considered in turn.

### B. Incentive to Sue

In arguing that the Court's decision in *AGC* does not preclude Local 959's standing, Local 959 suggests it should be granted standing because it is the only "victim" of the oil companies' conspiracy with sufficient incentive to sue to enforce the antitrust laws. Specifically, Local 959 argues that

[t]he Oil Companies, maneuvering against the Union, have conspired to convert union-affiliated companies into non-union operations. This "Jekyll-Hyde" transformation, coerced or plotted with the connivance of the Union-affiliated companies, leaves the "victims" of boycotts, price-fixing, and market allocation in the enemy camp, shoulder-to-shoulder with Defendants.[33]

This coerced metamorphosis is the key distinction between the instant case and *AGC:* when victim is transmogrified, into villain, only the union has the incentive to sue.

29. Plaintiffs' Opposition, *supra* note 14, at 3.

30. 740 F.2d 739 (9th Cir.1984).

31. Plaintiffs' Second Opposition, *supra* note 28, at 2–6.

32. Plaintiffs' Opposition, *supra* note 14, at 35–50.

33. Plaintiffs' Opposition, *supra* note 14, at 2.

34. Brief for Respondents 49, *AGC, quoted in AGC,* 459 U.S. at 542, 103 S.Ct. at 911.

The union plaintiffs in *AGC* made an identical argument to bolster their claim of standing. They asserted that:

Many unionized firms will respond to the alleged boycott ... by setting up double-breasted operations or shifting more of their resources to the non-unionized part of their operations when double-breasted operations already exist. In this manner, unionized subcontractors can avoid losing any business and, as a result, these subcontractors will *not* "possess the classic economic incentive to file suit." Alternatively, unionized subcontractors may simply not renew the collective bargaining agreement when it expires.[34]

This claim, that the union plaintiffs were the only parties sufficiently motivated to enforce the antitrust laws, and therefore should be permitted to sue, was rejected by the Supreme Court. The Court expressed doubt that the direct "victims" of the association's conspiracy, the firms suffering from coercion by defendants, "were actually harmed at all." [35] Assuming, *arguendo*, that these firms were injured,

The existence of an identifiable class of persons whose self-interest would motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party such as the [unions] to perform the office of a private attorney general.[36]

The Supreme Court therefore concluded that denying the *AGC* unions a remedy on the basis of their factual allegations was not likely to leave a significant antitrust violation undetected or unremedied.[37]

35. "Indeed," the court wrote, "if there is any substance to the [unions'] claim, it is difficult to understand why these direct victims of the conspiracy have not asserted any claim in their own right." 459 U.S. at 542 n. 47, 103 S.Ct. at 911 n. 47.

36. *Id.* at 542, 103 S.Ct. at 911.

37. *Id.*

■ For the same reasons noted by the Supreme Court in *AGC*, I reject the union's claim here that it possesses antitrust standing because it is the only party sufficiently motivated to bring suit. As was the case in *AGC*, it cannot be accepted that all of the direct victims of the oil companies' alleged conspiracy would refrain from bringing claims in their own right if their businesses were in fact injured by defendants' antitrust violations. Indeed, this court need not rely on mere conjecture to determine whether such an identifiable class of directly affected persons exists. Unlike the cases now under consideration, case number 84–318, which defendants have not moved to dismiss, is brought by ten individual owner-operators who claim to have been directly injured by the alleged antitrust conspiracy of the oil companies. Following the precepts of *AGC*, the existence of this identifiable class of *direct* victims now apparently before the court significantly diminishes the justification for allowing a more remote party such as Local 959 to perform the office of a private attorney general. Even more than in *AGC*, denying Local 959 a remedy on the basis of its allegations in this case is "not likely to leave a significant antitrust violation undetected or unremedied." [38]

### C. Nature of Harm

In holding that the unions in *AGC* lacked antitrust standing, the Supreme Court emphasized that various characteristics of the unions' alleged damages weighed against judicial enforcement of their claims. [39] Of paramount concern, the Court repeatedly stated that the unions' alleged injury was not "of the type that the antitrust statute was intended to forestall ... [for] the Union's labor-market interests seem to pre-

dominate, and [therefore] the *Brunswick* [standing] test is not satisfied." [40] In *AGC*, the Court assumed in the absence of specific allegations that the unions' primary harms resulted from frustrated attempts to organize previously nonunion firms and reduced dues payments and revenues derived from these activities. [41] The Court stated that Congress simply did not intend such harms to be cognizable under the antitrust laws. Rather they are essentially "labor-market" interests specially protected by Congress through a separate body of labor laws. [42]

The Court went on to write that the antitrust laws were enacted to "assure customers the benefits of price competition" and to protect "the economic freedom of participants in the relevant market." It then noted that the *AGC* unions were neither customers nor competitors in the market in which trade was restrained, the building subcontractors market. [43] Nor was it even clear whether these unions' economic interests would be served or disserved by enhanced competition in this market. [44]

■ Applying these criteria to the present case, it is evident that Local 959's "labor-market" interests predominate here. Local 959's primary harms, as opposed to those allegedly suffered directly by union-affiliated truck transportation companies and individual owner-operators, revolve around "its ability to effectively represent its members in collective bargaining." [45] Local 959 neither purchases, sells, nor provides truck transportation of products, equipment or supplies to the North Slope and is therefore "neither a consumer nor a

---

38. *Id.*

39. *AGC*, 459 U.S. at 542–45, 103 S.Ct. at 911–12.

40. *Id.* at 540, 103 S.Ct. at 910.

41. *Id.* at 541, 103 S.Ct. at 910.

42. *Id.* at 538–40, 103 S.Ct. at 909–10.

43. *Id.* at 538, 103 S.Ct. at 909.

44. *See supra* text accompanying notes 19 and 20.

45. Plaintiffs' Third Amended Complaint for Damages and Injunctive Relief (antitrust) ¶ 24 (filed Jan. 28, 1985) (hereinafter cited as Complaint).

competitor in the market in which trade was restrained." [46]

Moreover, while Local 959 does not have a collective bargaining relationship directly with defendants, it does, like the unions in *AGC*, have collective bargaining agreements with many of the companies allegedly boycotted or coerced by the oil companies. Thus, Local 959's primary goal in this lawsuit is not to preserve or enhance competition in the truck transportation market; indeed, as noted previously, the injuries alleged by the union may be the result of *increased* competition in the truck transportation market, resulting in lower rates and a reduction in the share of the market controlled by union-affiliated companies. Rather, Local 959's primary objective must be, as the Supreme Court noted in *AGC*, "to enhance the earnings and improve the working conditions of its membership," irrespective of competitive conditions in the market, and to do so in part by ensuring that union-affiliated trucking companies maintain as large a share of that market as possible.[47] Because such "labor interests" predominate, Local 959's alleged antitrust injury is, like that claimed by the unions in *AGC*, simply "not of the type that the antitrust statute was intended to forestall...." [48]

D. The "Labor Services Market" Allegation

In attempting to distinguish its harm from that suffered by the unions in *AGC*, Local 959 claims that more markets in the instant cases have been adversely affected by the oil companies' alleged conspiracy than were affected by the contractors' conspiracy in *AGC*. In *AGC*, the unions claimed that the only market affected by the contractors' conspiracy was that involving "the trade of certain contractors." [49] Local 959, on the other hand, alleges that in addition to the truck transportation shipping market, the market for "labor services provided in connection with said business" has also been injured by the oil companies' illegal activities.[50]

Local 959 added this allegation of the relevant market affected by the oil companies' claimed conspiracy following publication of the Supreme Court's decision in *AGC*. In holding that the unions in *AGC* lacked standing, the Court noted that their complaint did not allege "any restraint on competition in the market for labor union services...." [51]

Although Local 959 added this allegation to its complaint in an apparent attempt to distinguish the nature of its claims from that of the complaints in AGC, it failed to set forth how competition in the North Slope market for labor union services was diminished.[52] This notable lack of explication is in stark contrast to Local 959's treatment of the other alleged "relevant market" the union claims was adversely affected by the oil companies' conspiracy, namely, the market for truck transportation of North Slope supplies.[53] Nor does Local 959 shed much light in its briefing in support of its "labor services market" allegation.[54]

---

**46.** *AGC,* 459 U.S. at 539, 103 S.Ct. at 909.

**47.** *Id.*

**48.** *Id.* at 540, 103 S.Ct. at 910.

**49.** *Id.* at 523 n. 4, 103 S.Ct. at 901 n. 4.

**50.** Complaint, *supra* note 45, ¶ 16.

**51.** *AGC,* 459 U.S. at 527 n. 14, 103 S.Ct. at 903 n. 14.

**52.** Local 959's conclusory allegation that the market for labor union services in the North Slope was restrained by the oil companies' conspiracy is only mentioned in two sentences in its amended complaint. *See* Complaint, *supra,*

note 45, ¶¶ 16, 35. No explanations supporting this allegation are provided.

**53.** Local 959's complaint alleges at least fifteen separate means by which competition in the market for truck transportation services in the North Slope was allegedly diminished by the oil companies' conspiracy. *See id.* ¶¶ 25–27.

**54.** Plaintiffs' Third Supplemental Memorandum in Opposition to the Oil Companies' Motion to Dismiss, like plaintiffs' amended complaint, merely sets forth the conclusion that "[t]he actions taken against Union-affiliated trucking companies directly affected the market for labor services in North Slope trucking." *See* Plaintiffs' Third Opposition, *supra* note 28 at 5.

I find this lack of documentation unnecessary to my conclusion that this "labor services" market theory fails to save Local 959's complaint from the principles of *AGC*, however. For in noting that the unions in *AGC* had failed to make such an allegation, the Court did not state that the inclusion of this allegation would somehow *per se* defeat a motion to dismiss a similar complaint founded upon an antitrust conspiracy. To the contrary, it appears reasonable to assume that the Court intended its footnoted discussion of a "labor services market" allegation merely to exemplify one of many factors which *might* strengthen a union's claim of standing to bring a suit to enforce the antitrust laws.

I have evaluated Local 959's allegation that the North Slope's market for truck transportation labor services has been injured by the oil companies' conspiracy. I have found this bare allegation to be of minimal value to the union's claim of antitrust standing. Significantly, Local 959's complaint totally fails to spell out how competition in this market has been affected. Indeed, it is reasonable to infer that a reduction of union-affiliated truckers in the North Slope would lead to more competition in the market for truck transportation labor services than to reduced competition in the North Slope market.

Moreover, if, as Local 959 alleges, the oil companies' conspiracy has forced many North Slope truck transportation companies merely to "transmogrify" themselves into non-union shops, then it stands to reason that the number of such transportation companies competing in the relevant market has not been significantly affected at all.[55] Nor does it appear likely that Local 959's competition with other labor unions competing for labor union business in the North Slope has been reduced.[56]

Whether or not these conclusions are correct, however, it is clear that Local 959 is not a direct participant in the relevant market here. Rather Local 959 seeks to bring the claims of certain direct market participants, the injured truckers themselves, who, according to the union, have no incentive to bring suit notwithstanding their own antitrust injury. Because Local 959 itself is not a consumer or competitor in this market, however, under the teachings of *AGC* it must not be permitted such representational standing.[57]

### E. Damages

■ In addition to Local 959's claim of injury not being of the type historically protected under the antitrust laws, Local 959's alleged harms are also, like those which were claimed by the unions in *AGC*, "highly speculative."[58] In *AGC*, the Court noted two factors whose presence causes such antitrust damage claims to be speculative: (1) where an identifiable class of persons more directly injured by the complained of activity exists;[59] and (2) where the alleged damages "may have been produced by independent factors."[60]

Both of these factors are present in Local 959's antitrust damage claims now before me. The existence of more directly

Explanation of how this occurred is not provided here or in Local 959's other briefing.

**55.** This is certainly not to suggest, however, that such coercive activities engaged in by the oil companies to "union bust" would not contravene federal labor laws. Such a claim is not part of this litigation, however.

**56.** In noting that the amended complaint in *AGC* did not allege any restraint on competition in the market for labor union services, the Supreme Court further stated that "there is no claim that competition between rival unions has been injured or even that any rival unions ex-

ist." *See AGC*, 459 U.S. at 527 n. 14, 103 S.Ct. at 903 n. 14. By thus framing its discussion of "the market for labor union services," the Court implied that the state of competition amongst more than one union rather than of unionization generally might be the relevant inquiry here.

**57.** *See id.* at 539, 103 S.Ct. at 909.

**58.** *Id.* at 542, 103 S.Ct. at 911.

**59.** *Id.*

**60.** *Id.*

injured persons has already been noted.[61] It is also evident that Local 959's alleged harms may have been produced by other factors not directly traceable to the oil companies' claimed conspiracy.

The indirectness, and therefore speculativeness, of Local 959's damages is perhaps best demonstrated by the Supreme Court's discussion of the unions' claims of injury in *AGC*. There the Court wrote:

> If the Union asserts that its attempts to organize previously nonunion firms have been frustrated because nonunion firms wish to continue to obtain business from those subjected to coercion by the defendants, its harm stems most directly from the conduct of persons who are not victims of the conspiracy.... If the Union claims that dues payments were adversely affected because employees had less incentive to join the Union in light of expanding nonunion job opportunities, its damage is more remote than the harm allegedly suffered by unionized subcontractors. The same is true if the Union contends that revenues from dues payments declined because its members lost jobs or wages because their unionized employers lost business.[62]

The Court concluded that any harm to the unions in *AGC* was indirect. Because the unions were neither participants in the relevant market as competitors or consumers nor direct victims of the alleged restraint, they lacked standing to sue under the antitrust laws, even though, as here, the unions alleged that the defendants had in fact caused their injuries and had intended to harm them.[63]

As the Supreme Court found in *AGC*, in the claims now under consideration "the chain of causation between the Union's injury and the alleged restraint in the market ... contains several somewhat vaguely defined links...." [64] Because Local 959's injuries were "only an indirect result" of whatever harm may have been suffered by the union-affiliated truckers themselves, their claim to antitrust standing under *AGC* is further undermined.[65]

Finally, Local 959's damages claims implicate concerns of judicial management of complex antitrust trials similarly raised by the Supreme Court in *AGC*. In *AGC*, the Court warned that "massive and complex damages litigation not only burdens the courts, but also undermines the effectiveness of treble damages suits." [66] The danger of complex problems of apportioning damage claims is also present here.

Like in *AGC*, this court would face similar difficulties in "identifying damages and apportioning them among directly victimized [union-affiliated truckers] and indirectly affected employees and union enti-

---

**61.** *See supra* text accompanying notes 38–40.

**62.** *AGC*, 459 U.S. at 541 n. 46, 103 S.Ct. at 910 n. 46.

**63.** *Id.* at 540 n. 44, 103 S.Ct. at 910 n. 44.

**64.** *Id.* at 540, 103 S.Ct. at 910.

**65.** It is true that Local 959 heeded the statement of the Court in *AGC* by adding to its complaint allegations that (1) the aggregate share of the contracting market controlled by union firms has diminished; (2) the number of employed union members has declined; (3) the union's revenues in the form of dues or initiation fees has decreased; and (4) unionaffiliated firms have been subject to a complete boycott. *See* Complaint, *supra* note 45, ¶¶ 22–32. In *AGC*, the Court noted that the absence of these allegations was further evidence of the speculative nature of the unions' damage claims. The Court did not state, however, that the mere inclusion of these allegations in a similar complaint would necessarily mitigate the speculative nature of damage claims surrounding such alleged antitrust conspiracies. For the reasons noted, I have found Local 959's damage claims highly speculative due to their indirectness and the presence of an ascertainable class of more directly affected "victims" of the oil companies' alleged conspiracy.

**66.** *AGC*, 459 U.S. at 545, 103 S.Ct. at 912 (citing *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 745, 97 S.Ct. 2061, 2074, 52 L.Ed.2d 707 (1977)). (In *Illinois Brick*, the Court held that treble damages could not be recovered by indirect purchasers of concrete blocks who had paid an enhanced price because their suppliers had been victimized by a price-fixing conspiracy. The Court observed that a strong likelihood existed that potential plaintiffs would be in a position to assert conflicting claims to a common fund created through the suit.)

ties." [67] Each element of injury alleged by Local 959 results only indirectly from the conduct of the oil companies, with both union truck transportation companies and their employees intervening between defendants and the union in the chain of causation. Thus, for example, in the present case it would be necessary to identify and apportion damages suffered by the directly-victimized union-affiliated contractors, the indirectly-affected trucking company employees and, finally, the union. Additionally, it would be necessary to ascertain whether the allegedly boycotted companies continued to transport products to the North Slope under non-union auspices; and to determine whether and to what extent the compensation of union-affiliated employees was diminished and whether any such diminution affected payment of union dues or pension contributions. It also likely would require a determination as to which of the union's alleged injuries were actually caused by the oil companies' conduct and which were caused by increased competition and reduced profits in the trucking industry resulting from, for example, recent deregulation in this industry. As in *AGC*, this would be a highly speculative and imprecise task.

### F. *Ostrofe II*

In its recent pleadings, Local 959 places emphasis on the post-*AGC* decision of *Ostrofe v. H.S. Crocker, Inc.*[68] (*Ostrofe II*). According to Local 959, this Ninth Circuit decision "has disposed of most of the arguments the oil companies have raised in support of their Motion to Dismiss...." [69] Local 959's reliance on this case is misplaced.

The facts in *Ostrofe* were set forth as follows:

> Frank J. Ostrofe, former marketing director of H.S. Crocker, Inc., filed suit against Crocker for injuries resulting

from a violation of the Sherman Act. The complaint alleged that Crocker and other manufacturers of paper lithograph labels conspired to restrain interstate trade and commerce in such labels ... and that the conspiracy was effectuated in part by coercing Ostrofe, as Crocker's sales manager, to rig bids, fix prices, and allocate markets. Ostrofe violated the agreement by competing freely for business. Crocker's co-conspirators complained to Crocker's executive officers, who in turn warned Ostrofe to cooperate. Ostrofe refused. He was forced to resign from his job as Crocker's sales manager and allegedly he was boycotted from further employment in the industry.[70]

On the basis of these distinct facts, the Court of Appeals held that Ostrofe possessed "standing with respect to his suit against Crocker based on an implied agreement among label manufacturers to discharge him and interfere with his opportunity for re-employment in the labels industry." [71] The majority of the panel went on to state two reasons for granting Ostrofe "standing to challenge the conspiracy to fix prices and allocate sales in the market for labels." [72]

First, the majority concluded that Ostrofe had suffered "antitrust injury:"

> As sales manager of one of the label manufacturers, Ostrofe was an essential participant in the scheme to eliminate competition in the marketing of labels by fixing prices and allocating customers. It could not succeed without his active cooperation. When Ostrofe sold labels to customers not allocated to his employer and at prices below those agreed upon, his discharge was a necessary means to achieve the conspirators' illegal end as well as an integral and inextrica-

---

**67.** *AGC,* 459 U.S. at 545, 103 S.Ct. at 912.

**68.** 740 F.2d 739 (9th Cir.1984).

**69.** Plaintiffs' Third Opposition, *supra,* note 28, at 2.

**70.** 740 F.2d at 741–42.

**71.** *Id.* at 742.

**72.** *Id.* at 744.

ble part of the anticompetitive scheme....

Although Ostrofe was not a competitor or consumer in the labels market, the injury he sustained was such an integral part of the scheme to eliminate competition in that market as to constitute "antitrust injury" as that concept is developed in *McCready*.[73]

In the alternative, it ruled that he possessed standing even if he had not suffered "antitrust injury" as such:

... Assuming Ostrofe himself is held not to have sustained antitrust injury in the strictest sense from the conspiracy to fix prices in the label market, his refusal to cooperate with the conspiracy nonetheless helped vindicate the rights of customers and competitors in that market. Affording standing to sue to such an employee discharged because he refused to cooperate in an antitrust violation by his employer encourages exposure of such schemes by persons best situated to know of their existence....[74]

Central to the *Ostrofe* holding is Ostrofe's allegation that "his discharge was a necessary means to achieve the conspirators' illegal end as well as an integral and inextricable part of the anticompetitive scheme...." The present cases present different facts and policy considerations. Local 959's alleged damages were a derivative consequence of the oil companies' alleged conspiracy, not "an integral and inextricable part of the anticompetitive scheme."

Most importantly, in *Ostrofe* the court determined that denying the plaintiff standing was "likely to leave a significant

antitrust violation undetected or unremedied." It also found that the plaintiff's injury "is neither injury to others but is immediate and direct...."[75] As has been discussed, directly contrary conclusions have been reached here regarding Local 959's complaint. I therefore find that the court's holding in *Ostrofe*, rather than supporting Local 959's declaration of antitrust standing, further demonstrates that the union lacks such standing to proceed with its antitrust claims.

G. Section 16 Injunctive Relief

In addition to arguing that it has standing to seek treble damages under Section 4 of the Clayton Act, Local 959 claims to possess standing to seek injunctive relief pursuant to Section 16 of that Act.[76] The equitable relief Local 959 requests is an order "directing that defendants, and each of them, cease and desist from their illegal behavior...."[77]

Because the plaintiffs in *AGC* did not seek injunctive relief under Section 16, the Supreme Court did not consider whether they would have had standing to request such relief.[78] Nor has the Court considered the standing requirements of Section 16 in its other recent antitrust decisions.[79] The most recent decision of the Court which specifically contrasts the requirements of Section 16 standing with those of Section 4 is *Zenith Radio Corp. v. Hazeltine Research, Inc.*[80]

*Zenith Radio* involved a patent infringement action brought against Zenith in which Zenith counterclaimed for antitrust treble damages. On certiorari, the Court considered, among other things, the requirements Zenith had to meet in order to

73. *Id.* at 745–46.

74. *Id.* at 746–47.

75. *Id.* (citations omitted).

76. 15 U.S.C. § 26 (1982). For the pertinent text of this statute, *see supra* note 10.

77. Complaint, Prayer for Relief, *supra* note 45.

78. *AGC,* 459 U.S. at 524 n. 5, 103 S.Ct. at 901 n. 5.

79. *See, e.g., Blue Shield of Virginia v. McCready,* 457 U.S. 465, 467, 102 S.Ct. 2540, 2542, 73 L.Ed.2d 149 (1982); *Reiter v. Sonotone Corp.,* 442 U.S. 330, 337 n. 3, 99 S.Ct. 2326, 2330 n. 3, 60 L.Ed.2d 931 (1979); *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 726, 97 S.Ct. 2061, 2064, 52 L.Ed.2d 707 (1977); *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 491 (1977).

80. 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969).

be entitled to injunctive relief under Section 16. The Court noted that this provision of the antitrust laws was enacted by Congress "to make available equitable remedies previously denied private parties ... authoriz[ing] injunctive relief under the demonstration of 'threatened' injury."[81] The Court stated that this remedy is characteristically available even though the plaintiff has not yet suffered actual injury. The plaintiff "need only demonstrate a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue to recur."[82]

In *Zenith Radio*, the Court also noted that courts should not apply Section 16 relief too strictly:

> Section 16 should be construed and applied ... with the knowledge that the remedy it affords, like other equitable remedies, is flexible and capable of "nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims.... Its availability should be conditioned by the necessities of the public interest which Congress has sought to protect."[83]

This Supreme Court mandate to apply Section 16 flexibly has been followed by the majority of circuit courts that have been faced with suits seeking Section 16 equitable relief.[84] The Ninth Circuit is fully in accord as is evident in the recent case of *Parks v. Watson*.[85] In *Parks*, the court of appeals noted "we have recognized that the standing requirements of Section 16 are broader than those of Section 4."[86] In *Parks* the plaintiff, a company desiring to develop part of its real estate holdings, sued defendant city and its manager for alleged violation of the Civil Rights Act and the federal antitrust laws. The alleged violations arose out of the city's denial of a request to vacate certain platted city streets unless the company agreed to dedicate some of its land containing geothermal wells.[87] In its lawsuit, the company argued, among other things, that it was entitled to injunctive relief under Section 16 of the Clayton Act.[88]

The United States District Court for the District of Oregon rejected all of the com-

---

**81.** *Id.* at 130, 89 S.Ct. at 1580.

**82.** *Id.*

**83.** *Id.* at 131, 89 S.Ct. at 1580 (citations omitted).

**84.** *See, e.g., Parks v. Watson,* 716 F.2d 646, 662 (9th Cir.1983) (discussed in detail in text accompanying notes 73 to 83, *infra* ); *Associated of General Contractors v. Otter Tail Power,* 611 F.2d 684, 689 (8th Cir.1979) ("standing under § 16 has emerged as a separate and more lenient doctrine than under § 4" because precise determination of the extent of threatened injuries is not necessary); *Paschall v. Kansas City Star Co.,* 605 F.2d 403, 409 (8th Cir.1979); *In Re Beef Industry Antitrust Litigation,* 600 F.2d 1148, 1167 (5th Cir.1979) (permitting ranchers to sue supermarkets who allegedly depressed cattle prices for packers, who passed on depressed prices to ranchers); *Mid-west Paper Products Co. v. Continental Group,* 596 F.2d 573, 590–92 (3rd Cir.1979) (§ 16 standing "less constrained" than § 4 standing; injunctive relief lacks countervailing considerations of treble damage relief); *Tugboat, Inc. v. Mobile Towing Co.,* 534 F.2d 1172, 1174 (5th Cir.1976) (more demanding standing requirements for treble damage actions than for injunctive relief); *Jeffrey v. Southwestern Bell,* 518 F.2d 1129, 1132 (5th Cir. 1975) ("courts take a less constrained view of standings in suits involving injunctive relief than in those demanding treble damages"); *National Constructors v. National Elec. Contractors,* 498 F.Supp. 510, 519–20, 524 (permitting an indirect purchaser to sue under § 16), *aff'd.,* 678 F.2d 492 (4th Cir.1982); *Reiter v. Sonotone Corp.,* 486 F.Supp. 115, 121 (1980) (permitting § 16 injunctive relief to indirect purchasers; additionally, standing to sue under § 4 was allowed, reversed by the 8th Circuit, 579 F.2d 1077 (1978), and reinstated by the United States Supreme Court, 442 U.S. 330, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979)).

**85.** 716 F.2d 646 (9th Cir.1983).

**86.** *Id.* at 662 (citing *Hawaii v. Standard Oil Co.,* 431 F.2d 1282, 1284–85 (9th Cir.1970), *aff'd,* 405 U.S. 251, 261, 92 S.Ct. 885, 890, 31 L.Ed.2d 184 (1972) (In *Hawaii,* the Ninth Circuit flatly stated that "Section 16 ... is far broader than Section 4. Any person may secure injunctive relief against threatened loss or damage by violation of the antitrust laws. Section 4 provides for recovery of treble damages only by a person injured in his business or property by such a violation." 431 F.2d at 1284–85).

**87.** 716 F.2d at 649–50.

**88.** *Id.* at 661–62.

pany's claims, including its claim for antitrust equitable relief.[89] On appeal, the Ninth Circuit reversed the district court on several issues, including the lower court's treatment of the legal requirements of Section 16 injunctive relief.[90]

Finding that the district court had applied unduly restrictive criteria to Section 16 standing, the court of appeals set forth several reasons why the Ninth Circuit is and should be more lenient with claims of antitrust injunctive standing.[91] "The first significant difference is the lack of any mention of 'business or property' in Section 16. This omission clearly signals different [less restrictive] standing requirements [between] the two sections."[92]

To further demonstrate why claims of Section 16 standing should be treated more favorably than those seeking Section 4 relief the panel cited the earlier Ninth Circuit decision in *In re Multidistrict Vehicle Air Pollution*.[93] In that bellwether case, crop farmers had sued automobile manufacturers, charging that they had conspired to drag their feet on production of effective air pollution devices. The farmers, neither competitors with the manufacturers nor consumers of automobile pollution devices for purposes of the lawsuit, were denied standing to sue for treble damages under Section 4.[94]

The farmers were permitted to seek injunctive relief under Section 16, however. The court stated that broader standing under Section 16 is "fully justified" because of the difference between the remedies available under each section. "In contrast to Section 4, Section 16 does not involve punitive and potentially disastrous judgments for treble damages and attorneys' fees; neither is there the potential threat of duplicative recoveries."[95]

 It is clear in this circuit that standing under Section 16 is less restrictive than under Section 4. It remains, however, necessary for an antitrust litigant to sufficiently demonstrate that the *threatened* harm is "of the type that the antitrust statute was intended to forestall."[96] Because this threshold requirement must be met under both Sections 4 and 16, I conclude that Local 959 lacks standing to seek equitable relief as well as treble damages under the complaint before me.

As I have concluded in my analysis of Local 959's lack of standing under Section 4, Local 959's alleged harm is, as a matter of law, not the kind of antitrust injury Congress intended to punish.[97] I have also concluded that the union's claim of harm is "highly speculative," being only an "indirect result" of whatever harm may have been, or will in the future be suffered by the union-affiliated truckers themselves.[98]

## III. CONCLUSION

I now conclude that the antitrust claims in 83–171 and 83–172 fail to establish plain-

---

89. *Id.* at 649.

90. *Id.*

91. *Id.* at 662.

92. *Id.* (citing *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 261, 92 S.Ct. 885, 890, 31 L.Ed.2d 184 (1972)).

93. 481 F.2d 122 (9th Cir.) *cert. denied*, 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973).

94. 481 F.2d at 129.

95. *Id.* at 130–31. The court wrote here that: Unlike standing under section 4, standing under section 16 does not require an injury to "commercial interests" but only an injury cognizable in equity. For example, housing seg-

regations enforced by an antitrust conspiracy of realtors constitutes an injury to excluded minority members that confers standing for injunctive relief under section 16, *see Bratcher v. Board of Realtors*, 381 F.2d 723 (6th Cir. 1967), although not for treble damages under section 4. Since all appellees herein have alleged "threatened loss of damage" to interests cognizable in equity, [footnote] they have standing to seek equitable protection under section 16 of the Clayton Act.

96. *AGC*, 459 U.S. at 540, 103 S.Ct. at 910 (citing *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 485, 97 S.Ct. 690, 695, 50 L.Ed.2d 701 (1972)).

97. *See supra* text accompanying notes 39–48.

98. *See supra* text accompanying notes 61–67.

tiffs have standing to pursue these claims under either Section 4 or Section 16 of the Clayton Act.

IT IS NOW ORDERED the complaint in 83–171 and the antitrust claims in 83–172 are DISMISSED.